Chief Judge Fuld.
On this appeal — the case was previously before us three years ago (16 N Y 2d 206) —we are concerned only with the question of remedies. However, to place the issues in proper perspective, it will be helpful to summarize the facts established not only by the present record but by the earlier one as well.
The Village of Freeport having decided, in 1960, through its regularly authorized officials that there was a need to supplement its power plant by the acquisition of a 3,500 kilowatt generator, advertised for bids for the purchase and installation of such an engine. In early 1961, two bids were received, one from Enterprise Engineering Co. and the other from Nordberg Manufacturing Co. Enterprise’s bid was $615,685, while Nordberg’s, higher by some $58,000, was $673,840. The Village Water and Light Commission (the agency which initially passed on the matter), following the recommendation of its engineer, urged the Board of Trustees to accept Enterprise’s lower bid. However, before further action was taken, a new Mayor and two new trustees were elected and, upon the request of the former, the matter was deferred.
When, a short time later, the reconstituted Board of Trustees met, it summarily dismissed the members of the Water and Light Commission, accepted Nordberg’s higher bid and awarded the contract to that company.[1] Enterprise thereupon brought suit to rescind the award and succeeded in having the contract set aside. Then, despite the court’s direction that it “ award the contract as provided by law ”, the Board of Trustees arranged, over the objection of a majority of the Water *303 and Light Commission, for the drawing up of new specifications for a larger generator of 5,000 kilowatts. These specifications, ds we noted in our earlier opinion (16 N Y 2d, at pp. 210, 212), were prepared ‘ ‘ with the active assistance of a representative of the defendant Nordberg ” and were “ so slanted as to make impossible a bid on the second contract by any other manufacturer.”
As had been anticipated, Nordberg was the only bidder. Its bid, of $757,625, was accepted and it was awarded the contract.
These were substantially the facts which led us to hold in 1965 that there was such ‘ ‘ unlawful manipulation ’ ’ in preparing and submitting the specifications as to render the contract illegal (16 N Y 2d, at p. 209). We remitted the case for rendition of a judgment in favor of the plaintiff. The trial court, after a hearing, held that the Village should retain the generator, which was installed and in full operation, and should, in addition, recover from Nordberg the purchase price of $757,625 which it had paid. In reaching this conclusion, the court declared that the defendants, before ‘ ‘ final determination of litigation and with full knowledge of the possible consequences of an ultimate reversal * * * elected to proceed under the contract, make the installation and make payment.” And, the' opinion continued, “ [a]s a result of this perseverance in the face of uncertain consequences the village now * * * is in the intolerable position of being faced with the payment of higher costs for every facet of the project were the court to make an attempt to restore the parties to their original positions ” (52 Misc 2d, at p. 507). The judgment rendered also directed that the defendant Nordberg and the individual defendants, the Mayor and the trustees, pay counsel fees of $25,000.
On cross appeals by all parties, the Appellate Division modified the judgment by providing that, while Nordberg was to pay back the purchase price of the generator, it could retake the machine upon posting a bond of $350,000 to secure the Village against any damages stemming from the removal and replacement of the equipment. In addition, the Appellate Division absolved the individual defendants of personal liability for payment of counsel fees, directing that the sum fixed (by Special Term) be awarded the plaintiff out of the fund to be paid to the Village by Nordberg.
*304 Both the plaintiff and the defendant Nordberg have appealed to us from the Appellate Division’s order of modification.
We have not previously been called upon to fashion a remedy appropriate to a case such as this, where an illegal and void contract for public work, entered into in defiance of the competitive bidding statute (General Municipal Law, § 103) has been performed in full on both sides. We have, however, dealt with the situation, one step removed, in which the municipality has consumed or had the full benefit of illegally purchased goods or services but the vendor or supplier has not been paid. We have repeatedly refused, in such cases, to allow the sellers to recover payment either for the price agreed upon or in quasi-contract. One of our salient purposes in adopting- this rule has been to deter violation of statutes governing the spending of public moneys for goods and services. The restrictions imposed by such legislation, we recognized, are designed as a safeguard against the extravagance or corruption of officials as well as against their collusion with vendors. If we were to sanction payment of the fair and reasonable value of items sold in contravention of the bidding requirements, the vendor, having little to lose, would be encouraged to risk evasion of the statute; by the same token, if public officials were free to make such payments, the way would be open to them to accomplish by indirection what they are forbidden to do directly. (See, e.g., Albany Supply & Equip. Co. v. City of Cohoes, 18 N Y 2d 968, affg. 25 A D 2d 700; Seif v. City of Long Beach, 286 N. Y. 382, 387-388; People ex rel. Coughlin v. Gleason, 121 N. Y. 631; Dickinson v. City of Poughkeepsie, 75 N. Y. 65, 74-75; McDonald v. Mayor, 68 N. Y. 23, 28; Lutzken v. City of Rochester, 7 A D 2d 498; cf. Jered Contr. Corp. v. New York City Tr. Auth., 22 N Y 2d 187.)[2]
*305 There should, logically, be no difference in ultimate consequence between the case where a vendor has been paid under an illegal contract and the one in which payment has not yet been made. If, in the latter case, he is denied payment, he should, in the former, be required to return the payment unlawfully received—and he should not be excused from making this refund simply because it is impossible or intolerably difficult for the municipality to restore the illegally purchased goods or services to the vendor. In neither case can the usual concern of equity to prevent unjust enrichment be allowed to overcome and extinguish the special safeguards which the Legislature has provided for the public treasury. Although this court has not had occasion to pass on the question, appellate courts of at least two other states have so decided, holding that the vendor must pay back the amount received from the purchaser even though the items sold are not capable of being returned (see County of Shasta v. Moody, 90 Cal. App. 519, 523-524; McKay v. Town of Lowell, 41 Ind. App. 627, 638),[3] and we strongly favor this view. Only thus can the practical effectiveness and vigor of the bidding statutes be maintained.[4]
There was, therefore, justification—and precedent—for Special' Term’s decision directing Nordberg to repay the full purchase price of $757,625 and allowing the Village to retain the machinery which had been installed and was in operation. We conclude, nevertheless, though the patently illegal conduct of the defendants entitles them to little consideration, that the amount to be awarded should be less than that. We may adopt this course, in the unusual circumstances of the present case, without disturbing the salutary rationale and policy underlying such decisions as Albany Supply & Equip. Co. v. City of Cohoes *306 (18 N Y 2d 968, affg. 25 A D 2d 700, supra.) The sheer magnitude of the forfeiture that would be suffered by the defendant Nordberg, as well as the corresponding enrichment that would enure to the Village of Freeport, under Special Term’s determination adds an element to this case not to be found in any of those in which the principles we have been discussing have been applied.
Ordinarily, the application of the law to particular cases may not, of course, vary with the sums involved. But we must recognize that the rule with which we are concerned has unique aspects that make it appropriate for us to take into account the severity of its impact in eases as extreme as the present one. The purposes of our competitive bidding statutes may be fully vindicated here without our rendering so Draconian a decree as to subject the defendant Nordberg to a judgment for over three quarters of a million dollars. Justice demands that even the burdens and penalties resulting from disregard of the law be not so disproportionately heavy as to offend conscience. This, more than likely, was the reason for the Appellate Division’s modification of the judgment, affording Nordberg the option, conditioned on posting a sufficient bond, of removing the engine from the power plant. In our view, though, there is no warrant for allowing Nordberg this opportunity to recoup its loss or for subjecting the Village power system to the disruption and uncertainty that would result from dismantling the present installation. The courts should not invite unpredictable consequences of this kind. We must regard the machinery as unreturnable, as were the goods or services for which payment was denied in the cases cited above (p. 304).
Nor would it be sufficient to limit the judgment to the alternative amount proposed by Nordberg. Pointing out that its own bid on a 3,500 kilowatt machine exceeded the bid of its competitor, Enterprise, by 8.6%, the defendant suggests that it be required only to refund to the Village a sum equal to 8.6% of the price paid for the illegally purchased 5,000 kilowatt machine. This would result in the entry of a judgment against Nordberg of about $65,000 which, the defendant states, is what the court “ could presume to be a reasonable profit plus selling expenses.” Such a disposition, which would do little more than deprive the seller of its profit, would reduce to negligible proportions the *307 hazard of selling to a municipality in violation of the bidding regulations.
A more appropriate alternate remedy is available on the record before us, a remedy which takes into account both the wrong done to the Village by the defendants ’ callous disregard of the competitive bidding statutes and our policy of depriving sellers of any incentive to participate in such a violation. In point of fact, the remedy, lying well within the domain of equity, impresses us as one uniquely suited to the circumstances of this case.
The Board of Trustees, it is to be noted, had originally decided that a 3,500 kilowatt generator — such as the one for which specifications had been prepared—met the Village’s reasonable needs, and bona fide competitive bidding established that such an engine could be purchased for the sum of $615,685. The Village was diverted from that purchase by the persistent efforts of Nordberg to persuade the trustees, in disregard of the determination of their own Water and Light Commission, to rewrite the specifications in a way that would prevent any other manufacturer from submitting a competing bid. The successful result of this cynical maneuver — in the course of which a Nordberg employee became, to all intents and purposes, the author of the specifications—was the illegal purchase of the far more costly Nordberg engine.
We may estimate the ensuing loss to the Village by taking the difference between the $757,625 paid to Nordberg and the $615,685 which the Village would have paid if it had accepted the low bid of Enterprise for the 3,500 kilowatt engine the Village had earlier set out to procure. That difference is $141,940. To the sum just mentioned we should add the difference between what it cost the Village to install the Nordberg machine and what it would have cost it to install the one offered by Enterprise. The trial court’s finding that none of the construction and related costs incurred by the Village could be allocated to the installation of the engine must be stamped as error. The defendant Nordberg itself introduced into evidence the expert opinion of qualified engineers that the cost of installing its engine was $36,696 greater than the amount the Village would have had to expend for installing the Enterprise machine, and no one else testified to a lesser figure. We may assume *308 that the amount furnished by Nordberg’s- own witness is conservatively stated. The total of the two items mentioned is $178,636, and the judgment against the defendant Nordberg should be modified so as to direct payment of this sum to the Village, together with interest at the rate of 3% per annum — which is consistent with the rate (3.2%) payable by the Village on the bonds it issued to finance the acquisition of the generator — computed from December 16, 1964, the date on which Nordberg received the final installment of the purchase price.
Whether the individual defendants — the Mayor and the trustees—■ should have been held liable (along with Nordberg) for the damages awarded, as the plaintiff urges, was a matter resting in the sound discretion of the courts below (General Municipal Law, § 51). Since Special Term found — and the Appellate Division affirmed the finding—that nothing of value had been received by the individual defendants and since it evidently decided that judgment against Nordberg alone would afford the Village sufficient redress, we perceive no basis for interfering with this exercise of discretion.
We agree, too, that the plaintiff, having succeeded in the action for the benefit of the Village, is entitled to an allowance of counsel fees — in the amount fixed by the courts below—out of the fund created by his efforts. (See Nance v. Town of Oyster Bay, 54 Misc 2d 274; see, also, Matter of Attorney-General v. North Amer. Life Ins. Co., 91 N. Y. 57, 61-62.) Contrary to the defendant Nordberg’s contention, a plaintiff taxpayer, in a case such as this, is not restricted to an application for an additional allowance under CPLR 8303.
The order appealed from should be modified, without costs, in accordance with this opinion and, as so modified, affirmed.
Judges Burke, Scileppi, Bergan, Keating, Breitel and Jasen concur.
Ordered accordingly.

. The members of the Commission who had been replaced by new appointees challenged their dismissal and subsequently obtained a court order directing their reinstatement. (Matter of Amatulli v. Sweeney, 33 Misc 2d 324, affd. 17 A D 2d 631.)

. This prophylactic policy found expression in the rule which underlay our 1965 decision in the present case. As we then had occasion to declare, once a contract is proved, as it.was here, to have been awarded in violation of the statute — either without competitive bidding or by the manipulation of specifications so as to shut out such competitive bidding— “ a waste of public funds is presumed and a taxpayer is entitled to have the contract set aside without showing that the municipality suffered any actual injury ” (16 N Y 2d, at p. 208). The vice in such a situation, we said (p. 209), is that “the public 'has been deprived of the protection which the law was intended to afford.’ (Matter of Emigrant Ind. Sav. Bank, 75 N. Y. 388, 396.)”

. The courts of several other jurisdictions have reached a contrary result. (See Vincennes Bridge Co. v. Board of County Comrs., 248 F. 93, 98-102; Grady v. City of Livingston, 115 Mont. 47; Scott Twp. School Dist. Auth. v. Branna Constr. Corp., 409 Pa. 136.)

. In contrast, however, in real property cases, where the property which had been illegally sold was capable of ready return to the vendor — by the simple device of voiding the deed upon refund of the purchase price — we have sanctioned such return. (See Spadanuta v. Incorporated Vil. of Rockville Centre, 15 N Y 2d 755, affg. 20 A D 2d 799; Bauer v. City of Niagara Falls, 293 N. Y. 896, affg. 267 App. Div. 801.) It should be noted, also, that these cases did not, and could not, involve competitive bidding.