FABRIZIO & MARTIN, INCORPORATED, Plaintiff,

v.

The **BOARD OF EDUCATION CENTRAL SCHOOL DISTRICT NO. 2 OF** the **TOWNS OF BEDFORD** et al., Mars Associates, Inc., and Normel Construction Corp. of New Rochelle, a joint venture, Defendants.

No. 66 Civ. 2935.

United States District Court
S. D. New York.

Oct. 1, 1968.

Leslie A. Hynes, New York City, for plaintiff.

Louis E. Yavner, New York City, for defendants.

## OPINION

RYAN, District Judge.

Plaintiff, a contractor, seeks to recover damages for breach of contract and detention of materials, as well as for the value of services rendered in the construction of a school.

Plaintiff is a Connecticut corporation; defendants are the Board of Education, Central School District No. 2 of the Towns of Bedford, New Castle, North Castle and Pound Ridge, New York, and a joint venture composed of Mars Associates, Inc., and Normel Construction Corp., both New York corporations. Jurisdiction is predicated on diversity of citizenship.

The complaint pleads six counts or causes of action. The answer of defendant Board alleges seven affirmative defenses and two counterclaims.

Defendant Board now moves for summary judgment dismissing all plaintiff's causes of action and granting it the relief sought in the two counterclaims. Judge McLean, in a motion by defendant Board to compel arbitration, held on July 6, 1967 that the contract pleaded was void and unenforceable. Plaintiff consents to the dismissal of the first, third and fourth causes of action, based on that contract, leaving for determination the second, fifth and sixth causes of action.

Although before Judge McLean defendant Board defended the legality of

the contract and, in fact, precipitated his decision by moving to compel arbitration under it (which was denied by reason of the finding of the invalidity of the contract), it now moves to dismiss the entire complaint and for judgment in its favor upon the ground that this Court lacks jurisdiction over the subject matter because defendant is an agency of the State not suable in the federal court under the Eleventh Amendment save on a federal claim and because defendant Board is not a citizen of the State of New York and diversity of citizenship is not present. The defendant also has pleaded this in its Third Affirmative Defense, which was filed after Judge McLean's decision. If, as defendant alleges, there is no jurisdiction in this Court, then all prior proceedings, including the decision of Judge McLean, are a nullity. It is, therefore, imperative that this be our first determination, irrespective of the merits of the claims or defenses.

The first objection to jurisdiction is to be found in the Eleventh Amendment, which divests the Courts of the United States of jurisdiction of suits against any state by citizens of another state. The second objection is that a State is not a citizen, and that, therefore, a suit between a citizen of one state against another state is not a suit between citizens of different states (Highway Comm. of Wyoming v. Utah Construction Co., 278 U.S. 194, 49 S.Ct. 104, 73 L.Ed. 262; Krisel v. Duran, 386 F.2d 179 (2nd Cir.)). If defendant Board is found to be a civil division of the state, so that in reality the suit is against the state though not named as such, it may not be maintained in this Court. The Eleventh Amendment and Section 1332, U.S.C., Title 28, are clear that the federal court is without jurisdiction if the Board in law is the alter ego of the state; this is so quite independent of the question of its consent or lack of consent to be sued, which affects its sovereign immunity. Where jurisdiction is alleged on diversity of citizenship, consent cannot confer jurisdiction where it does not exist (State Highway Comm. of Wyoming v. Utah Construction Co., supra; Krisel v. Duran, supra). Although the question of the applicability of the Eleventh Amendment and Section 1332, U.S.C., Title 28, is a federal question, its resolution must turn in part at least on "the characteristics, capacities, powers and immunities of such agency as they are defined by the law of the State." (Fleming v. Upper Dublin Public School District (D.C.), 141 F. Supp. 813.)

Whether the Board of Education of Central School District No. 2 is an independent, separate corporate entity, capable of citizenship like any other public corporation, or a political subdivision of the State, is to be decided under the New York Education Law creating defendant and the New York decisions defining its status and nature. This but answers part of the problem, for even though for state jurisdiction purposes the Board may be sued and exposed to liability in the State courts as a corporate entity, for purposes of federal jurisdiction the federal test goes one step further and requires that the Court look behind the corporate structure and the claim being asserted to see whether it is the Board or the State who is the real party and whose pocketbook will be affected. (O'Neill v. Early, 208 F.2d 286, (4th Cir. 1953); School Board of City of Charlottesville v. Allen, 240 F.2d 59, (4th Cir., 1956) cert. den. School Board of Arlington County v. Thompson, 353 U.S. 910, 77 S.Ct. 667, 1 L.Ed.2d 664; De Levay v. Richmond County School Board, (4th Cir. 1960) 284 F.2d 340; Wihtol v. Crow (8th Cir. 1963), 309 F.2d 777; Fleming v. Upper Dublin Public School District (E.D.Pa. 1956), 141 F.Supp. 813; Thurman v. Consolidated School District No. 128 (D.C.Kan.1950) 94 F.Supp. 616.)

We must be mindful that the question of diversity is distinct from that of sovereign immunity. The fact that numerous actions on claims against the Board of Education have been entertained by the State courts not in the

Court of Claims which is the only forum in which the State is amenable to suit, while most persuasive, is not determinative of diversity jurisdiction in the action before us.

We also find that the character and nature of the activities the Board carries on are not determinative of the question for, as this Circuit said in Krisel v. Duran, supra:

"A state may, in its own name or through an alter ego, carry on activities which are traditionally regarded as proprietary functions but neither the state nor its alter ego thereby becomes a citizen for the purpose of diversity jurisdiction" (386 F.2d 181) (citing State Highway Commission of Wyoming v. Utah Construction Co., supra).

Here, concededly, the activities out of which this claim arose were governmental.

To sustain jurisdiction, we must find that a Board of Education of a Central School District is a corporate entity sufficiently independent and separate from the State as to carry its own citizenship, and not by this suit, expose the State to financial or other detriment.

The status of the defendant is defined in the New York statutes:

School districts are not municipal corporations. (General Municipal Law § 2, McKinney's Consol.Laws of New York, c. 24.)

The Education Law, Sections 1501 et seq. (McKinney's Consolidated Laws of New York, c. 16), exempts all school property from taxation. It also provides that money obtained from the sale of school property shall be applied for the benefit of the district as directed by the district voters. It then treats of the formation and dissolution of Common School Districts and Union Free School Districts by a district superintendent, and provides for Common School Districts, and the election of trustees who shall constitute a Board as a "body corporate", holding "as a corporation" all property for the use of the school in the district.

Central School Districts, of which the defendant is one, are treated separately in Sections 1801 et seq., of the New York Education Law. They are formed by order of the Commissioner of Education, who is authorized to lay out Central School Districts for the establishment of Central Schools to give instruction in elementary and high school subjects within stated boundaries defined by the Commissioner. After entry of the Commissioner's order, the Central School Districts and the Central Schools therein are established by petition and vote of the qualified voters, conducted under the supervision of the Commissioner of Education (Sec. 1802). The Central School District is managed by a Board of Education, whose members are elected, have the same powers and duties as Boards of Education in Union Free School Districts (see Section 1709, New York Education Law), and, where not inconsistent, are subject to all the provisions of the Education Law or any other general law relating to or affecting Union Free School Districts (Section 1804).

While the Central School District is not declared a body corporate, as is the Union Free School District, it is clothed specifically with all the powers and subject to the same limitations as the Union Free School, which includes authority to pay judgments against the school district by the levying of taxes. The recognition of exposure to judgment and the means with which to satisfy a judgment is recognition of the fact that it is exposed to suit.

■ It appears conclusively that, although a Central School District engages in the carrying out of a particularly important governmental function which traditionally is the responsibility of the state, it does so as an autonomous agency, at least with respect to the establishment, support, fiscal and business management and control of its schools. The most significant query put by the federal courts to determine who is the real party affected is answered in favor of the Cen-

tral School District since its funds are used to pay judgments and all operational expenses. The powers and duties which the statute confers upon it recognizes its almost total freedom from State restraint in these matters. Under this test, the Central School District is the real party in interest.

As early as 1922, we find the defendant Board of Education had the power and duty to superintend, manage and control the school (See Section 310 of the New York Education Law, now Section 1709, supra), and was subject to suit in the State Supreme Court for its acts. The language of Pound, Judge of the New York Court of Appeals, rejecting the contention that defendant was immune from suit because it was a governmental agency, is unequivocal. Judge Pound wrote:

> "When the state surrendered to the board a portion of its sovereign power and delegated to it a duty imposed upon the state by the Constitution (article 9, § 1) and it accepted the trust, it undertook to perform with fidelity the duties which the law imposed upon it. It is not immune from suit. * * * Although it acts in its corporate capacity, it is not absolved from liability as a governmental agency to the extent of the funds vested in it for the purpose by statute or which it is empowered thereby to raise by local taxation." (Herman v. Board of Education, 234 N.Y. 196, 201, 202, 137 N.E. 24, 25, 24 A.L.R. 1065.)

Since the Board was held not to possess immunity, the question of its consent to suit only in the Court of Claims never arose.

Although defendant recognizes this, it argues also that there is no jurisdiction in the federal courts because the federal courts, for purposes of the Eleventh Amendment, have construed a suit against a Board of Education as a suit against the State (citing O'Neill v. Early, supra; School Board of City of Charlottesville, Va. v. Allen, supra; and other decisions following that holding cited by the Board.)

A reading of these decisions discloses that, by applying the test of whose funds would be used to pay a judgment and who was, therefore, the party to benefit or suffer, the Courts concluded that the school boards or districts being sued were, in reality, the State or commonwealth and, therefore, not subject to suit in the federal courts because they lacked the requisite citizenship to confer jurisdiction. Thus, in O'Neill v. Early, supra, where it was alleged that the Board was an administrative department of the State of Virginia, the Court dismissed the suit on a finding that, in fact, it was an agency of the State sought to be held liable to judgment payable out of public funds. De Levay v. Richmond County School Board, supra, and County School Board of Arlington Co. v. Thompson, 240 F.2d 59, cert. denied 353 U.S. 911, 77 S.Ct. 667, 1 L.Ed.2d 664, recognized this as the controlling factor. Fleming v. Upper Dublin Public School District, supra, reached the same conclusion based on local law decisions which held that even though the school district was a body corporate, a quasi-municipal corporation, it was but an agency of the State performing governmental functions and, since it was the Commonwealth, not suable in the federal or state courts. Wihtol v. Crow, supra, held the school district an instrumentality of the State performing governmental functions at State expense. To these holdings, we subscribe.

██ Once we find that the defendant is not the State of New York, we must find that it is a New York corporation and, there being diversity of citizenship, there is no ground for urging that it may not be sued in the federal court. The defendant, like any other defendant, may not immunize itself from suit, if the jurisdiction is present (Gerr v. Emrick, 283 F.2d 293, cert. denied Pennsylvania Turnpike Commission v. Gerr, 365 U.S. 817, 81 S.Ct. 698, 5 L.Ed.2d 695). This conclusion does no violence to the local policy of New York for, as we have seen, these boards have been uniformly subjected to suit in the State courts in tort

as well as in contract. There is no reason for this Court's declining jurisdiction, even if it could.

We turn now to a consideration of the other grounds urged by defendant for dismissal of the Second, Fifth and Sixth causes of action, and for summary judgment in its favor on its Fourth and Fifth counterclaims which allege illegality of the contract, release and waiver and failure to file written verified claims. In the alternative, defendant seeks an order of this Court specifying the facts that appear "without substantial controversy." [1]

The Second Cause of Action, solely against defendant Board, is to recover $182,402.85, representing extra work and material furnished by plaintiff at the request of defendant. It realleges the first six paragraphs of the First Cause of Action (which is dismissed), pleading that on March 17, 1964, plaintiff, the prime contractor, and the defendant entered into the prime contract to furnish the materials and construct the Bedford Middle School; that plaintiff proceeded to perform and carry out the terms of the prime contract, except as such performance was interfered with and prevented by the acts of defendant; it also alleges the timely presentation of written verified claims by plaintiff and the lapse of 30 days since their presentation.

The Fifth Cause of Action against the defendant Board and the Joint Venture again alleges the execution and performance by plaintiff of the March 17, 1964 contract and its unlawful termination by defendant, and recites further that, while plaintiff was engaged in the performance of its prime contract, defendant on March 6, 1966 in breach of the contract terminated further performance of it by plaintiff and that plaintiff was ready and willing then and at all times to complete its performance of the prime contract. (These are allegations taken from the Fourth Cause of Action, which is also dismissed because it is based on the contract.) Here, again, plaintiff pleads due notice of claim and then goes on to allege that, after the Board terminated the contract, it refused to permit plaintiff access to the job site, in order to recover and remove the plaintiff's materials; that the joint venture has been using these materials and tools and that defendants continue to wrongfully detain them to plaintiff's damage in the sum of $66,904.02, their alleged value.

The Sixth Cause of Action against the Board alone realleges the timely presentation of written verified claims by plaintiff and the lapse of more than 30 days before the commencement of suit, and then pleads a claim in quantum meruit on the following facts: that between March 17, 1964 and March 8, 1966, plaintiff at the special instance and request of defendant performed work, labor and furnished services and materials in the construction of the Bedford Middle School, reasonably worth the sum of $2,762,379.04; that this amount became due and owing to plaintiff and that, although demanded, only the sum of $2,120,756.91 has been paid to plaintiff, leaving the balance due of $641,622.13.

The First and Second Defenses are general denials, except that they admit the execution of the prime contract on March 17, 1964 and the payment to plaintiff of the amount alleged. The defenses also admit the Board's refusal to allow plaintiff's employees to remove materials and tools from the job site, and the use by the joint venture of certain materials, tools, etc. "in accordance with the terms and provisions of the contract between plaintiff and defendant Board."

The Fourth Defense and counterclaim pleads the invalidity of the prime contract under New York General Municipal Law, and the decision of Judge McLean so holding, and seeks recovery of the payments made to plaintiff from April 29, 1964 to February 14, 1966, totalling $2,131,859, with interest, which

---

1. Defendant has not filed a Rule 9(g) statement.

payments the Board alleges were ultra vires and void.

The Fifth Defense and counterclaim realleges the making of the contract and the various breaches by plaintiff prior to January, 1965, and the giving of. notice by the Board of its intent to terminate the contract. It then alleges the making by the parties of a supplemental agreement on March 23, 1965, under which plaintiff waived all prior claims for extra work, undertook to indemnify defendant from claims by others, and agreed to complete the balance of the work by a certain date or pay specified liquidated damages which the Board might deduct from any amounts due plaintiff. Here, the Board also pleads the failure of plaintiff to furnish a written verified claim to the Board prior to action in accordance with Section 3813 of the New York Education Law; and alleges further breaches by plaintiff of both the prime contract and supplemental agreement by reason of which the defendant was compelled to complete the job itself and to employ others to perform work, labor and services to its damages in the sum of $410,000.

The Sixth Partial Defense of the Board pleads release by plaintiff of all claims arising prior to the execution of the supplemental agreement.

The Seventh Defense interposed by both defendants to the Fifth Cause of Action pleads the legality of the detention of plaintiff's tools and materials, the provisions of the Education Law and the General Municipal Law of the State of New York, and the provisions of the prime contract and of the supplemental agreement. Defendant Mars in this Seventh Defense pleads that, under its completion contract with the Board, it was required to use the plaintiff's materials; that plaintiff knew this and made no claim of ownership until it filed the action. The defendant contends that plaintiff, therefore, is barred by laches from prosecuting this claim.

Defendant Board seeks judgment on its two counterclaims for $2,131,859 with interest from the date of payment to plaintiff, and for $410,000 with interest from March 7, 1966.

The reply to the two counterclaims, which was served after the submission of this motion, denies most of these allegations, including the illegality of the contract. Although the reply admits the decision of Judge McLean holding the contract invalid and unlawful, it denies that the Board may not legally pay plaintiff. The reply also denies that the Board has been damaged by the payments made to it. The plaintiff in the reply admits the making of a supplemental agreement, but pleads its illegality, alleging that it was part of the prime contract. Affirmatively plaintiff in its reply alleges that it was fraudulently misrepresented by defendant Board to plaintiff that the prime contract was valid and legally binding, that plaintiff relied on the truth of this representation and that defendant is estopped from asserting the defense of illegality. The reply concludes with the allegation that the completion contract between defendants is void under the bidding provisions of the State statutes.

Although in this consideration of the motion before us we presume familiarity with Judge McLean's decision, it is necessary for our determination here to note that the basis of his holding—that the prime contract entered into between plaintiff and the defendant Board was void and illegal—lay in his finding that it had not been let out in accordance with competitive bidding requirements of Section 103(1) of the New York General Municipal Law, which directs that a contract shall be awarded to the lowest responsible bidder after advertising for sealed bids. What had taken place was that, when the lowest bidder withdrew its bid after the Board had advertised for sealed bids in keeping with the statutory provisions, the contract was awarded to plaintiff Fabrizio, the next lowest bidder, and that, simultaneously and without authority, the Board changed the specifications of the contract to omit work on the part of Fabrizio to the extent of $172,677. Fabrizio, prior to the

award to him, had sought to raise his bid, after the bids were in, by $172,677. The effect of these changes, Judge McLean held, changed the original bid and original specifications without giving other bidders the opportunity to bid on the job with changed specifications. In addition, Judge McLean found that the Board had signed a contract for the building of an athletic track (Alternate No. 3) for a price of $99,000, which was $4,000 more than had been authorized by the voters of the District. This, as in the reduction of the $172,677 item, was given the appearance of regularity by a change order executed without approval of the State Education Department as required by law. The Department had, under statute, prior to the advertising of the bids, approved the original plans and specifications upon the basis of which the contractors filed their original bids. Judge McLean found that the change order was not submitted to the State Education Department, if at all, until three days before he conducted the hearing on the contract's legality. With respect to the change order on the athletic track, Judge McLean found that plaintiff Fabrizio had already been paid $98,000 for this work.

We must also note that Judge McLean declined to consider whether the changes in the plans and specifications or the change in the athletic track had affected the value of the school, or whether they had saved money for the Board or provided equivalent facilities. All that he decided, and all that was before him, was whether the contract was valid, and he held that, under New York statutory law and the cases interpreting it (citing Gerzof v. Sweeney, 16 N.Y.2d 206, 264 N.Y.S. 2d 376, 211 N.E.2d 826), it was not.

There was no appeal from Judge McLean's decision denying defendant's motion for a stay of the suit and to compel arbitration.

■ Plaintiff, by its consent to dismissal of the three causes of action arising out of the contract, and defendant, by its motion for summary judgment

in its favor to recover the payments, acknowledge the finality of that decision. We agree with Judge McLean that New York law and the undisputed facts dictated the holding that the contract was null and void.

Judge McLean never reached the question of remedies remaining available to the parties, and it is that which is presented on the present motion.

In the first decision in Gerzof v. Sweeney, supra, Judge Fuld had held that in a taxpayer's suit to annul the contract and restrain its performance by the village or for damages, a contract whose specifications were so drawn as to preclude competitive bidding other than by defendant Nordberg Manufacturing Co. was void and illegal and to be set aside without showing injury to the village.

The second decision of the New York Court of Appeals in Gerzof v. Sweeney, 22 N.Y.2d 297, 292 N.Y.S.2d 640, 239 N.E.2d 521, rendered in 1968 since this motion was submitted, deals precisely with the question of remedies after the contract had been found void because in violation of the bidding statute (New York General Municipal Law, Section 103).

Upon the remand of "Gerzof" to the Supreme Court by the Court of Appeals for the entry of judgment for plaintiff taxpayer in accordance with the opinion, that Court held a hearing on assessment of damages (52 Misc.2d 505, 276 N.Y.S. 2d 485). The question presented was whether defendant contractor, who had been fully paid, should make restitution of all moneys received as well as respond in damages for payments incidental to the void contract, such as the interest on the bond issue, disbursements in connection with the letting and bidding of the contract, and costs incurred in installing the Nordberg generator. The real damages, it found, were the payments made to Nordberg for the generator, and it decreed that the Village should retain the generator as well as recover the purchase price of $757,625 which it had paid, but not the incidental expenses be-

cause there was insufficient evidence to allocate them to the Nordberg generator which was a part of an overall modernization project. It did allow counsel fees to plaintiff against all defendants.

Answering Nordberg's defense that equitable considerations applied because the village has received value for its money and no loss to the Village has been shown, and that the Village might not retain the generator and, at the same time, recover back the amounts paid, the trial court on remand made the following holdings:

"The law respecting municipal contracts in this jurisdiction is clear. By statute (General Municipal Law, § 103) moneys may not be expended without lawful authorization * * *. The Court of Appeals has held that the instant contract was unlawful and invalid. It therefore follows that no payment made or received thereunder was lawful. (Albany Supply & Equip. Co., Inc. v. City of Cohoes, 25 A.D.2d 700, 268 N.Y.S.2d 42) (p. 506, 276 N.Y.S.2d p. 487)

"Therefore damages are found to be the sums paid to Nordberg and Nordberg will be directed to make restitution of such sums. * * *

"Permitting the Village to retain the generator and directing repayment of the sums illegally paid is indeed a harsh result. Nevertheless the law is clear, and to permit literal application of equitable principles in this case would invite the evils the statute is obviously intended to prevent. This is a result the Courts of this State have not countenanced, notwithstanding the views held in other jurisdictions (Albany Supply & Equip. Co., Inc. v. City of Cohoes, 25 A.D.2d 700, 268 N.Y.S.2d 42, supra; Lutzken v. City of Rochester, 7 A.D.2d 498, 184 N.Y.S.2d 483). (p. 509, 276 N.Y.S.2d p. 489)."

And it reminded defendant that the Court of Appeals

"has given emphatic warning that equitable powers of the courts may not be invoked to sanction disregard of statutory safeguards and restrictions. (See also, Lutzken v. City of Rochester (7 A.D.2d 498, 184 N.Y.S.2d 483). Removal of the generator unit will not be allowed. (p. 507, 276 N.Y.S.2d p. 488) * * * *".

On cross appeals, the Appellate Division of the State Supreme Court modified the judgment by providing that, while Nordberg was to pay back the purchase price of the generator, it could retake it upon posting a bond of $350,000 to secure the village against any damages stemming from the removal and replacement of the equipment and directed that the counsel fees be paid solely by Nordberg.

When presented once again to the Court of Appeals on the appeal from the Appellate Division, Chief Judge Fuld held that, while there was justification and precedent for the decision of the trial court, the amount to be awarded to the Village while permitting it to retain the generator should be something less than the full purchase price, to wit, the actual money damages resulting to the Village from the purchase and installation of the Nordberg generator with interest from that time. The Court recognized that in reaching this decision it was straying from the established principle which it repeated in the clearest of terms:

"We have not previously been called upon to fashion a remedy appropriate to a case such as this, where an illegal and void contract for public work, entered into in defiance of the competitive bidding statute (General Municipal Law, Consol.Laws, c. 24, § 103) has been performed in full on both sides. We have, however, dealt with the situation, one step removed, in which the municipality has consumed or had the full benefit of illegally purchased goods or services but the vendor or supplier has not been paid. We have repeatedly refused, in such cases, to allow the sellers to recover payment

either for the price agreed upon or in quasi-contract. One of our salient purposes in adopting this rule has been to deter violation of statutes governing the spending of public moneys for goods and services. The restrictions imposed by such legislation, we recognized, are designed as a safeguard against the extravagance or corruption of officials as well as against their collusion with vendors. If we were to sanction payment of the fair and reasonable value of items sold in contravention of the bidding requirements, the vendor, having little to lose, would be encouraged to risk evasion of the statute; by the same token, if public officials were free to make such payments, the way would be open to them to accomplish by indirection what they are forbidden to do directly. (See, e. g., Albany Supply & Equip. Co. v. City of Cohoes, 18 N.Y.2d 968, 278 N.Y.S.2d 207, 224 N.E.2d 716, affg. 25 A.D.2d 700, 268 N.Y.S.2d 42; Seif v. City of Long Beach, 286 N.Y. 382, 387–388, 36 N.E.2d 630; People ex rel. Coughlin v. Gleason, 121 N.Y. 631, 25 N.E. 4; Dickinson v. City of Poughkeepsie, 75 N.Y. 65, 74–75; McDonald v. Mayor, 68 N.Y. 23, 28; Lutzken v. City of Rochester, 7 A.D.2d 498, 184 N.Y.S.2d 483; cf. Jered Contr. Corp. v. New York City Tr. Auth., 22 N.Y.2d 187, 292 N.Y.S.2d 98, 239 N.E. 2d 197.)[2]

"There should, logically, be no difference in ultimate consequence between the case where a vendor has been paid under an illegal contract and the one in which payment has not yet been made. If, in the latter case, he is denied payment, he should, in the former, be required to return the payment unlawfully received—and he should not be excused from making this refund simply because it is impossible or intolerably difficult for the municipality to restore the illegally purchased goods or services to the vendor. In neither case can the usual concern of equity to prevent unjust enrichment be allowed to overcome and extinguish the special safeguards which the Legislature has provided for the public treasury. Although this court has not had occasion to pass on the question, appellate courts of at least two other states have so decided, holding that the vendor must pay back the amount received from the purchaser even though the items sold are not capable of being returned (see County of Shasta v. Moody, 90 Cal.App. 519, 523–524 [265 P. 1032]; McKay v. Town of Lowell, 41 Ind.App. 627, 638, 84 N.E. 778),[3] and we strongly favor this view. Only thus can the practical effectiveness and vigor of the bidding statutes be maintained.[4]"

The Court of Appeals, notwithstanding its prior holdings, proceeded to fashion what it considered an equitable result because it concluded that it could do so "without disturbing the salutary rationale and policy underlying such decisions as Albany Supply & Equip. Co. v. City of Cohoes, 18 N.Y.2d 968, 278 N.Y.S.2d 207, 224 N.E.2d 716." The "sheer magnitude of the forfeiture" suffered by the defendant and the "corresponding enrichment" to the Village of Freeport were the "unusual circumstances" which impelled the Court to deviate from the principles it long had enunciated:

"The purposes of our competitive bidding statutes may be fully vindicated here without our rendering so Draconian a decree as to subject the defendant Nordberg to a judgment for over three quarters of a million dollars. Justice demands that even the burdens and penalties resulting from disregard of the law be not so disproportionately heavy as to offend conscience."

The *Albany* case cited by Judge Fuld held that:

"Although other jurisdictions may recognize a claim upon a quantum meruit or quantum valebant, even though there were irregularities or defects in the method of contracting for the services, it is clear that such is not the law in this State." Lutzken v. City of Rochester, 7 A.D.2d 498, 184 N.Y.S.2d

483 quoted in Albany Supply & Equipment Co. v. City of Cohoes, 25 A.D.2d 700, 268 N.Y.S.2d 42, aff'd 18 N.Y.2d 968, 289 N.Y.S.2d 207, 224 N.E.2d 716. Although Judge Fuld did not apply this principle in the case of a fully performed contract, his reaffirmance of *Albany* principles makes it clear that, in a suit predicated upon an unexecuted or partly executed contract, the New York law remains as previously enunciated.

■ It follows, therefore, that any claim being pressed by plaintiff or which emanates solely from the illegal contract whether under it or in quantum meruit, must be stricken as unenforceable.

■ The Second Cause of Action, as we have seen, is brought to recover for the "fair and reasonable value" of "extra and additional work, labor and services and * * * extra and additional material" furnished at the request of defendant. It realleges the execution of the prime contract and the timely presentation of verified claims "setting forth the claims stated herein." On its face this cause of action is to recover for extras performed under the prime contract in the construction of the school which was the subject matter of the invalid contract. The notice of claim, which sets forth this claim "for losses, increased costs * * * changes in the work to be performed under the contract, for deficiencies in the contract drawings and/or specifications * * * and changed conditions" states that the claims set forth are being made "in connection with the contract entered into" by the parties on March 17, 1964. The contract contained specific provisions relating to extra work and changes which the owner might order and provides that the "contract sum" is to be adjusted accordingly and that "all such work shall be executed under the conditions of the original contract." (Articles 3 and 15 of the General Conditions.) The attempt to alternatively plead in "quantum meruit", even if it could convert this contract claim into one in quantum meruit, would not save it since, first,

plaintiff may not under Gerzof v. Sweeney recover in quantum meruit under an invalid contract and, second, since the contract itself, if valid, provides that extras are part of the contract and to be recovered only under the contract price as adjusted. The Second Cause of Action must be dismissed as insufficient in law.

■ We take up the Sixth Cause of Action and we conclude that, under the New York Court of Appeals holdings, that, too, must fall. This claim is in quantum meruit for services performed in the construction of the school at the request of defendant during the existence of the prime contract and supplemental agreement. It also alleges the timely presentation of claims which, as we have seen, were made "in connection with the contract." It pleads the payment to plaintiff of $2,120,756.91, which was the money paid to plaintiff under the prime contract, as pleaded in the First Cause of Action. Like the Second Cause of Action, it is a claim to recover for the performance of plaintiff under the invalid contract and may not be asserted.

■ The Fifth Cause of Action is for wrongful detention of plaintiff's materials as a result of defendant's unlawful termination of the contract. The notice of claim which was made "in connection with the contract" recites that it is for "improperly and unlawfully prohibiting Fabrizio & Matlin, Incorporated, from removing its materials, tools and appliances from the job site after the Board of Education improperly and unlawfully terminated the contract of Fabrizio & Matlin, Incorporated * * *". Although plaintiff now says that this claim sounds in tort, it was asserted at a time when the contract was claimed to be valid by both plaintiff and defendant, when plaintiff was seeking damages solely for breach of contract with the Board as evidenced by the entire complaint and the notice of claim, which notice of claim relates only to the March 17, 1964 contract, but which plaintiff alleges embraces this 5th claim. Moreover, the de-

fense to this claim for detention is based on the terms of the contract, which defendant said contained specific provisions for removal and detention and further use of plaintiff's materials and tools.

As Judge Fuld pointed out in *Gerzof*, if a contractor under an invalid contract could recover on quantum meruit, he would be encouraged to risk evasion of the statute. Certainly, the same can be said if he were permitted to convert a contract claim into one sounding in tort in order to evade the statutory policy. The Fifth Cause of Action arises out of and is founded on the illegal contract and may not be asserted. However, this item of damage may be weighed and considered under the defendant's Fourth counterclaim, to which we now turn.

The Fourth and Fifth counterclaims upon which defendant seeks summary judgment present the crux of this litigation. As we have seen, the fourth counterclaim seeks recovery of the contract price so far paid to Fabrizio. Under the philosophy of Gerzof v. Sweeney, supra, while defendant may not under the Fourth counterclaim recover the entire amount it has so far paid Fabrizio, it may well recover from Fabrizio some of this money under the "Gerzof" guidelines.

We hold that, if the Court was of the opinion there that restitution of $757,625 by Nordberg was a forfeiture to him and an enrichment to the Village of such magnitude as to call for equitable intervention, it would be loath here to compel the repayment by plaintiff of over two million dollars without an inquiry into the merits. This action has not been tried; we are not in a position to know whether the Board received a benefit which might be found to be an "enrichment". Those are matters which must be resolved at trial.

█ Insofar as the Fifth counterclaim seeks damages flowing from breach of the prime contract and supplemental agreement by plaintiff, it cannot stand:

the prime contract, because it has been held illegal; the supplemental agreement because it depended for its existence on the continued validity of the prime contract. However, insofar as the Board seeks to recover damages incurred by it *in being compelled to complete the school*, it may well appear at trial that this is an item of damage recoverable under "Gerzof". Here, too, summary judgment cannot now be granted for the claim raises factual issues.

In sum, we hold that any claim or defense resting on the illegality of the contract is available to defendant; that it may not plead breach of the prime contract or supplemental agreement or release and waiver under either or failure to present verified claims; and that the issues remaining for determination are the damages which the Board suffered as a direct consequence of the illegal contract, including but not limited to the items enumerated by the Court of Appeals in "Gerzof".

Motion to strike the complaint is granted; motions for summary judgment on the Fourth and Fifth counterclaims are denied. So ordered.