Meyer, J.
(dissenting). While I agree that a claim for money had and received was not properly presented, I cannot concur in the majority decision which by an overly technical interpretation of section 112 of the State Finance Law countenances what amounts to a fraud on the claimant.
Downstate Medical Center is a teaching hospital which is part of the State University of New York. Students are taught by staff members who are under teaching contracts with the State University. To reduce the outlay for direct salary expense the staff physicians are permitted "the right of limited professional and independent clinical practice” under contracts with the university. Thus in 1969 an agreement, approved by the Comptroller, was entered into between the State University and the "Downstate Medical Group”, which represented the staff members of the Departments of Pathology, Radiology, Rehabilitation and Medicine at the Downstate Medical Center.
Under the agreement Downstate Medical Center billed the patients and collected payment for all services rendered in their case, retaining 68% of the receipts and remitting the other 32% to the medical group for the professional services of its members.
On December 31, 1970 Doctor Joshua A. Becker, the Chairman of the Department of Radiology at Downstate Medical Center, organized a professional corporation known as Joshua A. Becker, M. D. & Associates, P. C. The professional corporation consisted of the members of the Department of Radiology, and it took over from the Downstate Medical Group performance of the services the group had provided to the Department of Radiology under the terms of the 1969 agreement. No written agreement between the State University and the Joshua Becker professional corporation was ever executed.
*870 Nevertheless, the State Comptroller’s office honored the professional corporation’s vouchers for three months until April 1, 1971. Though the Comptroller refused to make payment thereafter, the radiologists continued to provide professional services, but when the vouchers they submitted remained unpaid the corporation filed a claim in the Court of Claims for services rendered between April 1, 1971 and December 31, 1973. That claim was settled on June 5, 1975 under circumstances detailed below. The instant action stems from claimants’ demand for compensation for services rendered between January 1 and December 31, 1974.
In resolving this controversy it is critical to focus on what transpired on June 5, 1975 when the parties settled their first dispute. That claim was resolved when Deputy Comptroller Martin Ives made the following statement on record:
"I have reviewed a letter of June 3rd, 1975 from James F. Kelly, Executive Vice Chancellor of the State University, that the University requires the continuing services of Joshua A. Becker & Associates at the Downstate Medical Center in the immediate future, and recommending the discontinuance of the present litigation based upon a contemplated administrative disposition by the State University.
"On the basis of Mr. Kelly’s letter the Department of Audit and Control will approve payment of an amount agreed upon by the State University and Joshua A. Becker & Associates for the period ending December 31st, 1973. However, nothing contained in this statement should be construed as an admission of liability on the part of the State of New York with respect to the matters presently in litigation.”
Although the Deputy Comptroller did not "admit liability”, his agreement to pay the 1971-1973 claim based on the fact "that the University requires the continuing services of Joshua A. Becker & Associates at the Downstate Medical Center in the immediate future” and in light of a "contemplated administrative disposition” was an approval by the Deputy Comptroller, sufficient to satisfy the requirements of section 112 of the State Finance Law of the professional corporation’s rendition of services to the university for the period between April 1, 1971 and December 31, 1973 and continuing to render those services after June 5, 1975, and, therefore, necessarily was an approval of the corporation’s rendition of service between January 1, 1974 and June 4, 1975. Those services were rendered or to be rendered under *871 the arrangement pursuant to which the group had provided services and pursuant to which payment for the period ending December 31, 1973 was being made, subject only to such change in that arrangement as might be made through further negotiation. That the Deputy Comptroller sought to limit the effect of the settlement as an admission does not mean that claimant was to receive nothing for its services if the administrative disposition did not materialize. Having approved the arrangement with the professional corporation in order to obtain the continuing services of its members, and having accepted 100% of the moneys resulting from the corporation’s members’ performance of services, the Comptroller must be held to have accepted the risk that an arrangement for lesser payments than 32% might not be worked out administratively.
To hold otherwise is to permit the Comptroller to use section 112 of the State Finance Law as an instrument of fraud, a result the Legislature cannot be presumed to have intended. Nor can it be said that the policy of safeguarding the public purse against extravagance or corruption enforced in cases such as Gerzof v Sweeney (22 NY2d 297) would be denigrated by a holding in favor of claimant. What we deal with here is not an impersonal procedure such as competitive bidding, which was involved in Sweeney, but with whether an official vested with the sole power of approval with respect to the rendition of services can approve the arrangement under which those services have been and are being rendered without incurring an obligation on the part of the State to pay for all of the services rendered.
Chief Judge Cooke and Judges Jasen, Gabrielli and Wachtler concur in memorandum; Judge Meyer dissents and votes to reverse in a separate opinion in which Judge Fuchs-berg concurs; Judge Jones taking no part.
Order affirmed.