OPINION OF THE COURT
Anil C. Singh, J.
At issue here is whether a child caregiver who provides services to families on public assistance based on referrals from the New York City Human Resources Administration (HRA) may seek reimbursement for services provided after the public assistance recipients became ineligible for child care benefits where HRA never notified the caregiver that the benefits had been terminated. '
Social Services Law requires public assistance recipients to participate in employment and education programs as a condition to receive public assistance grants. When an applicant for public assistance is unable to participate in a program because of a lack of child care HRA provides the names of two potential care providers in locations convenient to the applicant. The names are obtained from a city registryi of child care providers. The applicant is given a “Child Care Confirmation Form” with the names and addresses of the care providers. The applicant then arranges with one of the providers for child care.
In 1998 HRA issued a reference guide for the benefit of licensed child care providers who served parents on public assistance who were part of HRA’s welfare ¡to work programs. The manual sets forth basic steps that a care provider must take in order to get paid. Care providers were advised that they would be contacted by a parent or worker to set up an appointment. If the parent decided to utilize the caregiver’s services, a child care provider form would be filled out by the caregiver with all pertinent information including the number of hours the child would spend at the facility and license/permit numbers. The care provider was to confirm the eligibility start date of the parent. The manual provides that if a parent does not attend their assigned activities, the caregiver would not be paid. However, the manual also states that the provider will be notified when a parent became ineligible for child care. “You will receive a Notice of Participant Termination (also known as a Suspension Letter) when FIA determines that a pajrent has lost eligibility for child care . . . If a parent has lost eligibility, you will not be paid for any child care provided beyond the date of the letter.”
Plaintiff Linda Poey is a duly licensed child care provider who renders child care at her home at 667 West 177th Street. She *545 seeks reimbursement for child care provided to the families of three public assistance recipients, Dulce Sanchez, Claudette Scatliffe and Rosa Peguero. Ms. Poey did not have an independent relationship with the families. They were referred to Ms. Poey by HRA. Each came with a child care provider form which listed Ms. Poey as one of two potential caregivers. It was agreed that Ms. Poey would provide child care to the three families. Ms. Poey filled out the form on the back stating the hours child care services would be provided, her license number and other pertinent information.
Ms. Poey provided child care to the two children in the Sanchez family from February 3, 1999 through April 5, 1999. Utilizing HRA’s rates Ms. Poey calculates that she is owed $1,339.20. After this litigation was commenced Ms. Poey states that HRA sent her a check of $82.40 for the care provided to the Sanchez family. She returned the check.
Care was also given to three children in the Scatliffe family between April 19, 1999 and August 6, 1999. Ms. Poey calculates that she is owed $6,096. On May 9, 1999 she received a check from HRA for $475.20. Ms. Poey states that she is still owed $5,638.80.
Ms. Poey provided care to the Peguero family between August 23, 1999 and September 3, 1999 for a total of $442.20. In December 2002 HRA tendered the payment. Ms. Poey still seeks interest on the late payment.
Ms. Poey made numerous requests for payment. Her attempts to obtain reimbursement for the services were unsuccessful, spawning this litigation. She seeks recovery under the theory of either an implied contract or a quasi contract. HRA has denied liability. Both parties now move for summary judgment.
HRA does not dispute that Ms. Poey provided the Sanchez and Scatliffe families with child care. The refusal to pay is based on the denial of public assistance benefits to Ms. Sanchez and Ms. Scatliffe for failure to comply with the work accountability requirements. Termination of benefits made these two individuals ineligible for child care benefits. However, in Ms. Sanchez’s case, HRA attempted to make a payment of $82.40 for child care services rendered on dates Ms. Sanchez was complying with the accountability requirements.
Although HRA notified Ms. Sanchez and Ms. Scatliffe that they were no longer eligible for continued child care benefits, it is undisputed that Ms. Poey was not notified by HRA that the *546 benefits had been terminated and thatj payment would not be made for future child care. In fact, Ms. Poey on a prior occasion in 1997 had received a notice from HRA advising her that the benefits of an HRA referred public assistance recipient were terminated and that the “client is not longer eligible for child care services.” Since neither Ms. Sanchez nor Ms. Scatliffe told her that they were no longer eligible for child care benefits, Ms. Poey continued to care for their children.
Discussion
Generally a claim for quantum menjit may not be asserted against a municipality where the underlying contract is illegal or void even where the municipality benefitted and restoration is impossible (see Seif v City of Long Beach, 286 NY 382 [1941]; S.T. Grand, Inc. v City of New York, 38 AD2d 467 [1st Dept 1972]; Albany Supply & Equip. Co. v City of Cohoes, 25 AD2d 700 [3d Dept 1966]). This rule has been justified as a means of protecting the public interest by discouraging the violation of statutes governing the expenditure of pdblic funds (S.T. Grand, Inc., supra) and to “safeguard the taxpayers’ interest against extravagance and collusion on the part of public officials” (Gill, Korff & Assoc., Architects & Engr. v County of Onondaga, 152 AD2d 912 [4th Dept 1989]).
However, there is a limited exception to the rule that allows for recovery against a municipality under the theory of an implied or quasi contract where the services accepted by the municipality are an appropriate item for an express contract and within the contractual power of the municipality (see 27 NY Jur 2d, Counties, Towns and Municipal Corporations § 1221). Vrooman v Village of Middleville (91 AD2d 833, 834 [4th Dept 1982]) illustrates this principle. The Court held that
“A plaintiff is entitled to recover from a municipality where, as here, he has entered into a contract in good faith, the municipality possesses the authority to enter the contract, the contract is not violative of public policy and the circumstances indicate that if plaintiff is not compensated, the municipality would be unjustly enriched.”
In Vrooman the defendant Village was ordered by the State to abate the discharge of sewage into state waters. Plaintiff was retained at the request of the Village to provide engineering services relating to the planning and design of a sewage treatment facility. The Village refused to pay contending that the contract was not enforceable. The Appellate Division found that plaintiff *547 was entitled to recovery in quantum meruit. The State had ordered the Village to stop the discharge of pollutants and plaintiff’s services were necessary to effectuate the directive. The services benefitted the taxpayer and to absolve the municipality of liability would encourage officials to disregard statutory safeguards.
HRA’s suggestion that Vrooman is contrary to the precedent from the Court of Appeals and First Department is without merit. The Court of Appeals on at least two occasions has recognized recovery in quasi contract where services were provided under a void contract (see Parsa v State of New York, 64 NY2d 143 [1984] [physician could bring a suit in quasi contract against the State for monies paid by the federal government for services performed under a state contract]; see also Gerzof v Sweeney, 22 NY2d 297 [1968] [seller of a generator was permitted to retain most of purchase price from a village despite the contract being a product of collusive bidding]).
Here, state law requires a recipient of public assistance to attend work related programs. HRA has implemented a program whereby licensed providers, such as Ms. Poey, render child care so that parents can attend work programs. HRA had the authority to enter agreements with care providers. HRA’s reference guide sets out the procedures that caregivers must follow in order to receive payment for child care to public assistance recipients. It is not disputed that HRA regularly pays caregivers for providing child care to public assistance recipients.
Ms. Poey entered into the contract with HRA in good faith to provide child care to the families of public assistance recipients based on referrals from HRA. She provided the services with the expectation that she would be compensated. Ms. Poey was not notified by HRA that Ms. Sanchez and Ms. Scatliffe were no longer eligible for continued child care benefits because they had failed to comply with the work accountability requirements. This failure was contrary to the statement in HRA’s reference guide that a notice of termination or suspension sent to caregivers advising them that a parent has lost eligibility for child care. Therefore, Ms. Poey would not have known to stop providing child care.
The child care services provided by Ms. Poey are important and in the public interest. State law mandates work fare programs in order to reduce dependence on public assistance. Licensed caregivers provide a safe environment in which to leave young children while parents receive important training *548 to become self-reliant. This is clearly| in the interest of the taxpayer and a benefit to society. Conversely, not paying Ms. Poey for the services she rendered may result in the reduction and quality of child care that families of public assistance recipients should receive. Finally, HRA would be unjustly enriched if Ms. Poey is not compensated for the services provided to HRA’s clients in accordance with the state mandate.
Plaintiffs motion is granted and defendant’s is denied.
Ordered that the clerk enter judgment in favor of plaintiff and against defendant in the sum $6,978 with interest at the statutory rate from May 1, 1999, together with costs and disbursements.