**FABRIZIO & MARTIN, INCORPORATED, Plaintiff-Appellee-Appellant,**

v.

**BOARD OF EDUCATION CENTRAL SCHOOL DISTRICT NO. 2 OF the TOWNS OF BEDFORD ET AL., Defendant,**

**The Board of Education Central School District No. 2 of the Towns of Bedford Et Al., Defendant-Appellant-Appellee,**

**Aetna Casualty & Surety Co., Additional Defendant on the Counterclaim of Defendant Board of Education, Defendant-Appellee-Appellant.**

**Nos. 206, 339, 340, Docket 74–1661, 74–1699, 74–1706.**

United States Court of Appeals, Second Circuit.

Argued Nov. 26, 1974.

Decided Sept. 9, 1975.

Burton M. Weinstein, Bridgeport, Conn. (Weinstein, Krulewitz & Weiner, Bridgeport, Conn., on the brief), for plaintiff-appellee-appellant.

Louis E. Yavner, New York City (Jeffrey H. Gallet and Robert I. Oziel, New York City, on the brief), for defendant-appellant-appellee Bd. of Ed.

Julius L. Schapira, New York City (Max E. Greenberg, Trayman, Harris, Cantor, Reiss & Blasky, David A. Trager, George N. Toplitz, New York City, on the brief), for defendant-appellee-appellant Aetna Cas. & Sur. Co.

Before CLARK,* Associate Justice, and MOORE and TIMBERS, Circuit Judges.

MOORE, Circuit Judge:

In November 1963 the Board of Education Central School District No. 2 of the Towns of Bedford, New Castle, North Castle and Pound Ridge (the Board) had before it the question of the construction of a new school to be known as the Bedford Middle School. Even then there must have been controversy in the Board because the vote was three to two to proceed. Controversy has been plaguing all parties connected with the construction over the last twelve years. Various phases have reached the courts, State and Federal. The controversy has been the subject of decisions by Judges McLean, Ryan, Wyatt and Carter as well as by a panel of this Court (Judges Moore, Smith and Hays).

Since the facts are virtually undisputed, it ought to be possible from the perspective of this twelve year span to arrive at the appropriate legal conclusions which should be drawn therefrom and to dispense such justice as may be appropriate between the parties. The nature of the various appeals and the actions from

* Hon. Tom C. Clark, Associate Justice (Ret.) of United States Supreme Court, sitting by designation.

which they stem can best be stated as the facts unroll in chronological order. And, since it is only upon the specific facts of this specific case that we are called upon to reach a judicial conclusion, of necessity the facts must be set forth in some detail.

After the Board's close decision in November 1963 to proceed with the school, in conformity with New York's General Municipal Law, Section 103(1),[1] it invited the submission of bids for the construction and landscaping thereof. Six bids were submitted of which the three lowest were:

| | |
|---|---|
| Rand Construction Company | $2,276,800 |
| Fabrizio & Martin, Inc. | $2,326,900 |
| Walter A. Stanley Construction Company | $2,549,000 |

Two days after the bids had been opened on January 7, 1964, Fabrizio discovered a mathematical error in its bid of $171,000 and requested by letter of January 9, 1964 permission to withdraw or rebid. On January 22, 1964 the Board (again by three to two vote) called a meeting of voters to act upon the bids and a bond issue to finance construction. The Board awarded the contract to Rand as the low bidder, subject to approval by the voters at a meeting to be held on February 20, 1964. In the meantime Rand, too, discovered that it had made a mathematical error in its bid and by notice (February 5, 1964), withdrew its bid, to which withdrawal the Board consented. Even if the $171,000 mathematical error had been rectified, Fabrizio would still have been the low bidder because the Stanley bid was some $222,000 higher. Therefore, the Board decided, and under the law was required, to proceed with Fabrizio if possible.

Discussions ensued between the Board, the architect and Fabrizio as to how to solve the problem and, prior to the voters' meeting (February 20, 1964), Fabrizio said that if awarded the contract it would withdraw its letter of withdrawal.

There were obviously two methods by which this could be done, namely, to add the $171,000 to the $2,326,900 resulting in $2,497,900, leaving Fabrizio still the lowest bidder (some $51,000 under Stanley) and hence entitled to the award under the law, or, if the Board desired to spend only $2,326,900 to save this amount by eliminating certain items to the extent of $171,000.

Accordingly, a meeting was held on February 10, 1964 to discuss, and resolve if possible, the problem. Present were members of the Board, its legal counsel, the architect and Fabrizio. Advice of counsel was sought by the Board as to whether other bidders might complain. Counsel advised that the Board could "sign the contract and immediately sign change orders" and the Board would be subject to "No exposure". Appendix p. 86. Fabrizio took the position that "I would be willing to cooperate as much as you people would like me to." Appendix p. 86. The Board suggested that the

---

1. Section 103(1) of the New York General Municipal Law provides as follows:

. . . (1) Except as otherwise expressly provided by an act of the legislature or by a local law adopted prior to September first, nineteen hundred fifty-three, all contracts for public work involving an expenditure of more than thirty-five hundred dollars and all purchase contracts involving an expenditure of more than fifteen hundred dollars, shall be awarded by the appropriate officer, board or agency of a political subdivision or of any district therein including but not limited to a soil conservation district, to the lowest responsible bidder, furnishing the required security after advertisement for sealed bids in the manner provided by this section. In any case where a responsible bidder's gross price is reducible by an allowance for the value of used machinery, equipment, apparatus or tools to be traded in by a political subdivision, the gross price shall be reduced by the amount of such allowance, for the purpose of determining the low bid. In cases where two or more responsible bidders furnishing the required security submit identical bids as to price, such officer, board or agency may award the contract to any of such bidders. Such officer, board or agency may, in his or its discretion, reject all bids and readvertise for new bids in the manner provided by this section.

second of the alternatives be adopted and that Fabrizio endeavor to eliminate items totalling $171,000. Fabrizio was agreeable to this solution. The Board and its architect approved and the Board's legal counsel advised that the proposed changes presented no legal problem.

This plan was carried out by using the original plans and specifications, the figures of Fabrizio's uncorrected bid and simultaneously executing a change order to reflect the parties' agreement concerning the $171,000.

On February 20, 1964, the voters authorized the construction and the awarding of the contract to Fabrizio at its bid figures. On March 17, 1964 the contract and change order for the $171,000 adjustment were executed by the Board and Fabrizio.

On the same date Aetna Casualty and Surety Company (Aetna) executed a performance bond in favor of the Board, as Obligee in the amount of $2,489,400, the condition of the bond being the prompt and faithful performance of the contract by Fabrizio.

Prior to the signing of the formal contract on March 17, 1964 and the change order, the architect and the Board's counsel had specified the items which could be eliminated or changed "setting forth the dollar amount by which each deletion or change would reduce Fabrizio's cost." These items approximated the $171,000 mathematical error. Appendix p. 87.

Despite the fact that other change orders were submitted to the State Education Department during the course of construction, the change order of March 17, 1964 was not.[2]

Fabrizio commenced construction but almost from the start there were disputes. Fabrizio claimed among other things that the Board was slow in paying monthly requisitions and that it delayed executing change orders. The Board, in turn, also expressed dissatisfaction with Fabrizio's work. These dis-

agreements continued and on or about January 21, 1965 Fabrizio walked off the job. The Board then gave notice (copy to Aetna) of its intention to terminate the contract. In an endeavor to resolve the disputes and to permit a resumption of the work, meetings were scheduled involving the Superintendent of Schools, counsel for the Board, Fabrizio, counsel for Fabrizio, a representative of Aetna and others. As a result of these meetings an agreement (the Supplemental Agreement) was executed on March 23, 1965 by the Board, Fabrizio and Aetna which, after reciting the original contract of March 17, 1964, the disputes, the termination notices, the meetings to resolve the differences, reached a solution apparently satisfactory to the signatories.

Work on the construction of the school under this Supplemental Agreement and the original agreement continued for almost a year.

Apparently words and agreements could not restore harmony between the Board and Fabrizio and on March 5, 1966[3] Fabrizio stopped all work and walked off the job site.

The school had not yet been completed. Again the interested parties, the Board, Fabrizio and Aetna (now a party to the Supplemental Agreement) met, on April 5, 1966, to find if possible, a solution so as to enable the school to be completed. As the trial judge found "Aetna proposed a solution and Fabrizio agreed that if that solution was acceptable it would complete construction by July, 1966." The Board, however, rejected this solution and of its own volition secured another contractor and retained defendants Mars Associates, Inc. and Normel Construction Corp. of New Rochelle, a joint venture (Mars-Normel), to complete construction.

*Legal Proceedings*

It is not surprising that as a result of the construction controversies, legal proceedings were to follow—and they did.

2. The order was submitted in June 1967 during the litigation and approved.

3. On March 2, 1966 Fabrizio advised the Board that it was terminating the contract.

On September 13, 1966 Fabrizio filed a complaint against the Board and Mars-Normel containing six causes of action which may be summarized as follows:

FIRST: Unpaid balance of $309,219.28 for services rendered in construction of a school under contract for the amount of $2,429,976.19.

SECOND: Extra work—reasonable value $182,402.85.

THIRD: Failure by Board to supply adequate plans; interference with work, $150,000.

FOURTH: Termination by Board, March 6, 1966 caused loss of profits, $22,000.

FIFTH: Against Board and Mars-Normel, detaining and refusal to surrender Fabrizio's tools, $66,904.02.

SIXTH: Work, labor, services and materials reasonably worth the sum of $2,762,379.04.

Subsequently and before answer the Board (by Motion No. 86) sought to stay the action "on the ground that plaintiff's claims are arbitrable under a 'valid written agreement' between the parties." Appendix p. 70. Fabrizio (by Motion No. 9) sought to amend its complaint by adding a count for a declaratory judgment determining the validity of the construction contract. Two taxpayers (by Motion No. 56) sought leave to intervene to allege that the contract was invalid because it was not awarded as the result of competitive bidding, hence, in violation of Section 103 of the General Municipal Law of New York. Two former members of the Board were said to support the motion. The Board opposed. Although the court denied leave to intervene, it gave the taxpayers the right to appear as *amici curiae* but limited their appearance to the question of the legality of the contract. The court conceded that neither Fabrizio nor the Board took the position that the contract was invalid. The court denied Fabrizio's motion for a declaratory judgment but set the arbitration motion down for hearing on the theory that the validity of the contract could be tested thereby.

The court then held a hearing and wrote an opinion finding the facts substantially as previously set forth.

Based upon these facts in substance, Judge McLean posed as his legal hypothesis and foundation for his opinion:

"A contract made by a board of education in violation of the competitive bidding requirement of this [Section 103(1), New York General Municipal Law] section is void." Appendix p. 92.

He supported this conclusion by citing many New York decisions discussed below dealing with, in our opinion, quite inapposite fact situations.

Analyzing in brief review the material facts vis-a-vis the Board and Fabrizio, the Board had complied with Section 103(1) requirements by advertising for bids. It was then bound to award the contract to the lowest bidder. Even with the mathematical error Fabrizio was still the lowest bidder. Whether the error was to be adjusted by an increase of $171,000 or a deduction of work in this amount was a matter for the Board's decision and for its business judgment. In arriving at such a decision, the Board sought and secured the advice of its architect and its counsel. Fabrizio apparently was completely indifferent to which method was used. The Board chose the latter. We cannot subscribe to Judge McLean's conclusion that "[h]ere the Board in effect permitted Fabrizio to change his bid after all the bids were in." Appendix p. 93. The court implied that it would have been proper for the Board to allow "him [Fabrizio] to increase the dollar amount of the bid" but improper to accomplish "the same result by permitting him to omit some of the work called for by the original plans and specifications". Appendix p. 93. This, however, was a decision for the Board—not the courts. Nor is there any support for the factual conclusion that "[T]he work that Fabrizio was called upon to perform was different from that which all the other contractors

were asked to bid on." Appendix p. 94. The specifications upon which bids were submitted were identical. It serves no purpose to assume as the court did that "the statute would have been contravened if the Board had offered Fabrizio a formal contract different from and less onerous than that which it offered to other bidders" (Appendix p. 94) because the Board did no such thing. It was faced with the necessity of making a practical decision. Its original low bidder Rand had withdrawn. Its next low bidder Fabrizio was anxious to withdraw. Had it done so, the Board would have been left with the Stanley bid of $2,549,000, $222,100 higher than Fabrizio. Obviously it was in the interest of the taxpaying public to retain Fabrizio. The same specifications submitted to all alike were used except for the Board's election to adjust the $171,000 by saving on items aggregating $171,000 instead of increasing the price.

 We do not mean to suggest that the Board, even acting in good faith, could avoid the obligation to solicit an additional round of bids if the changes involved were significant enough to involve a substantial possibility that another bidder might undercut Fabrizio on the amended construction plans. The public is entitled under the statute to have the job done at the lowest cost. The possibility of achieving a bid lower than Fabrizio's on the plans as changed, however, does not appear to us substantial, considering the monetary value of the changes in light of the contract price and the amount by which other contractors' bids would have exceeded Fabrizio's price on the original plans.

From these facts, and in our opinion a misapplication of New York law, Judge McLean concluded that the Fabrizio contract had not been awarded in compliance with Section 103(1) and was therefore void. We disagree.

Up to this time (July 6, 1967) no answer had been filed by the Board. The Board which had steadfastly asserted the legality of its actions, and the validity of the contract with Fabrizio made pursuant thereto, with opportunistic acumen suddenly realized that its conduct in conformity with Section 103(1) had been turned by Judge McLean's opinion into the making of a contract in violation of that section and hence was "illegal and void". Despite the fact that they had a school building built largely by Fabrizio, by a counterclaim the Board sought to recover all amounts ($2,131,859) paid to Fabrizio under the contract. By way of a second counterclaim and quite inconsistently the Board reverted to its "void" contract and sought damages thereunder of $410,000 for Fabrizio's alleged failure to properly perform. Mars-Normel also interposed a defense based on its contract with the Board to complete the school. In its reply the Board countered with its claim of contract illegality.[4]

The Board, asserting the illegality of its previously-considered-legal actions, by motion for summary judgment, sought to dismiss all Fabrizio's causes of action and to be given the relief sought in its two counterclaims, namely, return of the money paid to Fabrizio for construction and for the extra cost of completion. The motion came on before Judge Ryan. Fabrizio apparently consented to dismissal of its first, third and fourth causes of action (based on the contract) so that Judge Ryan only dealt with the second (the extras), the fifth (the tools) and the sixth (*quantum meruit*) causes of action.

Judge Ryan, because there had been no appeal from Judge McLean's decision and because Fabrizio had consented to dismissal of the contract causes of action, accepted "the finality of that decision." 290 F.Supp. 945, 952 (S.D.N.Y. 1968). In addition, Judge Ryan agreed with Judge McLean that the contract was "null and void". Judge Ryan then proceeded to analogize the facts of this case to those presented to the New York Court of Appeals in *Gerzof v. Sweeney,*

4. Of necessity this recital of the pleadings is sketchy. Reference is made for greater certainty to the pleadings themselves.

16 N.Y.2d 206, 264 N.Y.S.2d 376, 211 N.E.2d 826 (1965) and endeavored to fashion a remedy along the lines set by Judge Fuld in his opinion, *Gerzof v. Sweeney*, 22 N.Y.2d 297, 292 N.Y.S.2d 640, 239 N.E.2d 521 (1968), in that case, albeit there was no factual similarity between the cases. Judge Ryan concluded that the Board had available defenses based on the illegality of the contract and that the issue remaining was what damages the Board suffered as a direct consequence of the illegal contract "including but not limited to the items enumerated by the Court of Appeals in '*Gerzof*'". 290 F.Supp. at 956. Judge Ryan therefore struck the complaint and denied summary judgment on the Board's Fourth and Fifth counterclaims. Judge Ryan's opinion was dated October 1, 1968. Appeal was rejected by this court because of lack of finality.

The Board, then seeking to capitalize further on its newly discovered derelictions, turned its attention towards its surety, Aetna, both under the original surety bond and the Supplemental Agreement, and claimed that, as a result of Fabrizio's shortcomings, it had been forced to pay $520,000 to complete the school. The Board's complaint against Aetna was dated March 10, 1969.

In answer to the Board's complaint Aetna sought to take advantage from both Judge McLean's and Judge Ryan's opinions and disclaimed any liability under its bond which, it alleged, had been given to assure performance of an "illegal contract." In addition, Aetna pleaded lack of knowledge of the illegality and fraud.

Fortified by these decisions, Aetna moved for summary judgment dismissing the complaint. Judge Wyatt granted the motion and denied the Board's motion for summary judgment in its favor.

At this stage an appeal reached this court for the first time in September 1971—some eight years after the school project was undertaken by the Board.

This court held that dismissal of the Board's claim against Aetna under the bond was error and remanded the action to the district court to consolidate it with the Fabrizio-Board action "so that all the facts bearing on the rights of the parties may be adduced."[5] The purport of this court's decision, albeit possibly not expressed with the clairvoyance gained after a review of the four judges' opinions and a better appreciation of the facts, was that "it was for proper performance of this [the school's] construction work that Aetna stood surety." and that Aetna both in the original surety agreement and the Supplemental Agreement undertook to insure that Fabrizio would faithfully perform his contract with the Board. We said that the damages, if any, "can only be made after full development of the facts relating to the underlying equities, vis-a-vis the Board and Aetna" 453 F.2d at 268 (1971). This was the state of the record when the case involving the Board-Fabrizio-Aetna controversy came on for trial before Judge Carter so that after ten years of warfare their respective rights might be determined.

Judge Carter found that the basic facts were not in dispute. Particularly "basic" were the facts that the Board, to obtain the lowest bidder, accepted Fabrizio's miscalculation of $171,000; that it was the Board itself which "suggested that Fabrizio eliminate agreed-upon items of work totalling $171,000 so that the contract could be awarded to Fabrizio at the original bid of $2,326,000"; that "[T]he Board, its counsel and the architect approved this course of action and implemented its effectuation"; and that the effect of this implementation via the change order was to permit Fabrizio to "cut out $171,000 of work called for in the plans and specification, without a reduction of $171,000 from the bid submitted." Judge Carter's opinion, Appendix pp. 1054 *et seq.* The Board ratified these arrangements on March 25, 1964.

---

**5.** *Board of Education Central School District No. 2 v. Aetna Casualty & Surety Co.*, 453 F.2d 264, 268 (2d Cir. 1971).

Accepting these facts, Judge Carter then took as the foundation for his conclusion the opinions of Judges McLean and Ryan and the cases on which they relied and assumed that the contract here was "void". An examination of the cases cited by the four judges as establishing such a principle shows that these decisions bear no relationship to the problem before us and are in no way authoritative, precedential or even persuasive.

In *Jered Contr. Corp. v. N. Y. C. In. Auth.*, 22 N.Y.2d 187, 292 N.Y.S.2d 98, 239 N.E.2d 197 (1968), the plaintiff, a painting contractor, entered into a written contract with the Transit Authority. The plaintiff and a company officer, Jerome, were indicted for perjury in connection with submitting "false noncollusive bidding statements" to another agency. In an action by the plaintiff to recover for its services on a *quantum meruit* basis, the Court of Appeals reversed the striking of the defense of illegality based "on alleged fraudulent and collusive bidding practices engaged in by the plaintiff, in order to obtain the award of the contract." 22 N.Y.2d at 191, 292 N.Y.S.2d at 102, 239 N.E.2d at 200. The Court held that where the competitive bidding statute had been "thwarted by the unlawful collusion of the bidders themselves, resulting in a gross fraud upon the public", the courts of New York "will decline to lend their aid to the fraudulent bidder who seeks recovery." 22 N.Y.2d at 193, 292 N.Y. S.2d at 103, 239 N.E.2d at 201.

*Gerzof v. Sweeney*, 22 N.Y.2d 297, 292 N.Y.S.2d 640, 239 N.E.2d 521 was decided a week after *Jered*. In this case the Village of Freeport advertised for bids for a generator. Two bids were received, one from Enterprise Engineering Co. for $615,685; the other from Nordberg Manufacturing Co. for $673,840. The appropriate Commission recommended acceptance of Enterprise's lower bid. However, an intervening election installed a new Mayor and two new trustees who ousted the Commission members and accepted the higher bid. Then, over the objection of the Commission (reinstated by court order) and with Nordberg's assistance, the Commission redrafted new specifications, which only Nordberg could meet, for a $757,625 generator.

The New York Court of Appeals held that this was "unlawful manipulation" which rendered the contract illegal. 16 N.Y.2d at 209, 264 N.Y.S.2d 376, 211 N.E.2d 826. The Court, in hearing the appeal from a judgment directing Nordberg to repay the entire $757,625, addressed itself to the appropriate damages, not here material. It was quite obvious that the Village trustees in concert with Nordberg had conspired by a "cynical maneuver" to prevent any other bid from being submitted.

*S. T. Grand, Inc. v. City of New York*, 32 N.Y.2d 300, 344 N.Y.S.2d 938, 298 N.E.2d 105 (1973) involved outright bribery of a public official to obtain the contract. Naturally under those circumstances, there was no extenuating situation which would avoid imposing forfeiture against the bribing contractor. As the Appellate Division in its opinion in the same case said:

"In light of the flagrant corruption permeating the instant contract, the total avoidance of any public bidding and the public's deprivation of an honest, disinterested determination as to whether or not the work contracted for was even needed, to require this respondent to return the fruits of its criminal conduct should not offend the conscience." 38 A.D.2d at p. 471; 330 N.Y.S.2d at 598.

In contrast here, the Board admittedly complied with the State statute in advertising for bids. It followed the directions of the statute in accepting the lowest bidder. There was no bribery of, or even any attempted undue influence upon, any Board member by Fabrizio. Nor was there any violation of any charter requirement. In short, the principle

for which these cases stand is wholly inapplicable here.[6]

▉▉▉ Such damages as may have been incurred arose not out of any fraudulent or collusive conduct on the part of the Board or Fabrizio but solely out of Fabrizio's failure to perform its contract, walking off the job and compelling the Board to complete the school. In calculating damages there are many factors to be considered. Fabrizio and Aetna offered to complete. The Board refused to accept the offer. Fabrizio performed extra work not contemplated by the original contract. Was the work done by Mars-Normel within or without the original specifications as modified by the change order of March 17, 1964? Aetna's surety bonds were to compensate the Board for Fabrizio's failure of performance. There may be additional items for which the Board may be entitled to recoupment. The Board's financing charges are not and should not be an item of damage as the result of a breach of the contract or a *quantum meruit* item. All extras, namely, items not embraced within the specifications as adjusted are the Board's responsibility. Aetna quite properly raises questions related to the completion work performed by Mars-Normel, MacNamee and Bradhurst. Thus, for example, Aetna asserts that the Board claims it had paid Mars-Normel $428,164 for its completion work whereas the Mars-Normel guaranteed maximum cost contract was for $403,000. Differences are alleged to exist between amounts paid and amounts certified as unfinished for masonry and carpenter work. Discrepancies are also claimed as to work performed and amounts paid to MacNamee and Bradhurst. Aetna is entitled to question these alleged payments, since the items may come within its performance bond. Naturally, if any of the work so performed did not fall within Fabrizio's

original undertaking exclusive of change orders (except the original adjustment) Aetna would not be liable.

These are matters which may be taken up by the parties on any hearing which the trial court may direct as to the ascertainment of damages. In essence, Fabrizio failed to complete, Aetna guaranteed performance and was responsible within the limits of Fabrizio's original undertaking. The Board by its own decision engaged others to complete. Aetna would only be liable for the cost of such completion according to the Fabrizio specifications.

The Board now—but not at the time of letting the contract—would hold itself out as a champion of the public and the taxpayer and even as a knight of old, would clad itself in the defensive armor of New York cases all based upon patent fraud and collusion. It urges us "to fashion an equitable remedy which will punish the contractor for breaching its affirmative duty not to enter into illegal contracts and so preserve the sanctity of the public bidding statute." (Board, Brief p. 17). This we have tried to do but on the fairer basis because the facts clearly call for the conclusions that Fabrizio did not enter into an illegal contract, that the Board did not violate the sanctity of the public bidding statute and that the Board by its decision gave the public that which the statute was designed to give it—a contract based upon the lowest bid.

During the oral argument the court, hopeful that an inter-party adjustment might be made to avoid further litigation, inquired as to whether the parties could not arrive at the actual out-of-pocket costs sustained by each and for which each claimed reimbursement. The hope was not fulfilled.

The Board, adopting its "illegal and void" contract theory under its First

---

6. Both *Albany Supply and Equipment Co. Inc. v. City of Cohoes*, 25 A.D.2d 700, 268 N.Y.S.2d 42 and *Lutzken v. City of Rochester*, 7 A.D.2d 498, 184 N.Y.S.2d 483 are inapposite because in those cases there had been a direct violation of the requirements of the city charters.

Counterclaim sought the return of all amounts paid to Fabrizio. In its response this amount was reduced to the $171,000, presumably the Fabrizio mathematical error. The Board calls this amount "a *Gerzof* deterrent to bidding statute violations." Since we hold that there are no facts which would justify such a conclusion, there is no basis for this item.

As to the Second Counterclaim, namely, completion cost excess over Fabrizio's total contract price and change orders, the Board claims $165,430. To this figure it would add an alleged increased interest cost of $115,366 incurred in its financing the project. The responsibility for the financing was the Board's and there is no basis for this item in computing damages.

The excess of $3,000 paid in connection with the athletic track may be a subject for further proof or adjustment.

Further consideration upon remand will have to be given to Fabrizio's claim in the amount of $66,904 that the Board unlawfully kept Fabrizio's equipment and tools which were later sold. The damages, if any, resulting therefrom will have to be made the subject of appropriate findings based upon such proof as may be adduced.

The suits in other courts will have to be dealt with when liability, if any, is determined therein. Judge Carter properly excluded proof thereon in this case.

In an endeavor to bring to an end this eleven year old controversy the case is reversed and remanded to the district court for a determination of appropriate damages along the lines herein set forth with the suggestion that if the trial court so desires and the parties so stipulate, these issues may be referred to a Magistrate.