[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
The instant case is a suit for an injunction by Prete Enterprises, Inc., an unsuccessful bidder on Bid Package No. 10 Phases I and II which encompassed certain concrete work for the new East Haven High School. The defendants are the Town of East Haven, Fusco Corporation (Fusco), who is serving as the Town's construction manager for the high school project; Bartlett, Brainard, Eacott, Inc. (BBE), the successful bidder and Manafort Brothers, Inc. (Manafort), another unsuccessful bidder who is doing the actual work on Bid Package No. 10 as the subcontractor of BBE. Oral and written evidence was received over a four day period. At the end of the hearing the parties agreed that the evidence could be considered in light of the plaintiff's request for a permanent as well as a temporary injunction. Also when the hearing ended, the plaintiff filed without objection a second amended complaint. CT Page 7581
From the evidence, the court finds that the facts set forth below were established.
 I.
Conn. Gen. Stat. § 10-287(b) provides as follows:
 All orders and contracts for school building construction receiving state assistance under this chapter shall be awarded to the lowest responsible qualified bidder only after a public invitation to bid, which shall be advertised in a newspaper having circulation in the town in which construction is to take place, except those contracts or orders costing less than ten thousand dollars and those of an emergency nature, as determined by the commissioner of education, in which cases the contractor or vendor may be selected by negotiation, provided no local fiscal regulations, ordinances or charter provisions conflict.
Chapter VI § 4(c) of the charter of the Town of East Haven, entitled Bidding Requirements, reads in part that:
 It is provided, however, that all purchases of and contracts for the purchase of personal property, including a continuing order or contract for more than one fiscal year, supplies, materials, equipment or contractual services, with the exception of professional services, and all sales of personal property and contractual services, which shall be made by or on behalf of the Town of East Haven, shall be made upon the basis of competitive bids when in the opinion of the Director of Finance said purchases or contracts to purchase or sales or contracts for sale shall involve the expenditure or receipt of more than $4,000.00 . . . . the Director of Finance shall invite sealed bids or proposals giving ten (10) days public notice thereof by publication at least once in the newspaper having circulation in the Town. All such CT Page 7582 sealed bids or proposals shall be opened publicly. With respect to purchase, the Director of Finance may accept the lowest responsible bid submitted or may reject all or any part of such bid or proposal. With respect to sales, the Director of Finance may accept the highest bid submitted or may reject all or any part of such bid or proposal.
In accord with the aforestated statutory and charter provisions the Town of East Haven issued an invitation to bid for, among others, Bid Package No. 10. The invitation stated that "Sealed bid proposals will be received until 2:00 P.M. on Friday, March 31, 1995, in the Office of the Finance Department, Lower Level, East Haven Town Hall, 250 Main Street, East Haven, CT 06512, and will be publicly opened and read aloud at East Haven Community Beach House, Cosey Beach Avenue at Intersection of Coe Avenue, East Haven, CT. Bids received after the time set for the opening will not be considered and will be returned unopened." Bid package No. 10 included both a Phase I and Phase II. Short descriptive terms for the two phases would be site work concrete for Phase I and building concrete for Phase II. At an earlier date, the Phase I work had been let out to bid separately. Pasquale Centore, Fusco's project manager, had in his budget at least $300,000.00 for the Phase I work. The lowest bid received, however, was $350,000.00 promoting the decision to include both phases in a single bid package.
Bob Forsyth was the estimator who prepared BBE's bid for Bid Package No. 10. Although the Construction Manager's written bidding requirements stated that Bid Package No. 10 encompassed both Phase I "Site Work Concrete" and Phase II "Building Concrete", Forsyth, before BBE's bid was submitted, called Fusco and spoke to either Pasquale Centore or someone named Smolin about whether Phase I was included. Forsyth made a note of his conversation after the bids were opened on March 31, 1995. Forsyth's estimate came to $1,720,501.00. Jim Eacott, the president of BBE reduced it to $1,704,000.00 and on March 31, 1995, submitted a bid in that amount.
When the bids were opened, BBE's bid of $1,704,000.00 was the lowest, the plaintiff's bid of $1,964,000.00 was second lowest and a bid submitted by Manafort in the amount of $1,978,500.00 was third lowest. CT Page 7583
On Monday, April 3, 1995 when Pasquale Centore was reviewing the opened bids prior to preparing a summary of them for the Town, he realized that the work to be done in Phase I had been omitted from BBE's low bid. This error was substantive as opposed to an arithmetic, typographical or clerical error. Jim Eacott called Pasquale Centore about the error on April 3. Centore suggested that BBE send a letter and he would discuss the matter with the appropriate persons from East Haven. The letter from BBE, dated April 3, addressed to Fusco and signed with Eacott's name admitted the omission of Phase I concrete work from the bid price. For relief, the letter suggested an upward adjustment in price or a withdrawal of the bid.
Centore "faxed" BBE's letter to Carl Tomchik, East Haven's Director of Finance. The Town's answer came in a letter written on April 4, 1995, denying the request of BBE to adjust or withdraw the bid.
Centore arranged a meeting on April 7, 1995 where he, Eacott, Attorney Albis, Town counsel, and Attorney Zullo, counsel to the School Building Committee, were present. At the meeting, BBE offered to do the work (Phase I and Phase II) for $1,900,000.00. In the afternoon of April 7, 1995, Centore informed Eacott that East Haven would be willing to accept a bid of $1,850,000.00. Eacott's response was "let's split the difference." Centore said to put it in writing whereupon Eacott sent by fax to Carl Tomchik a revised bid of BBE for Bid Package No. 10 in the amount of $1,872,500.00.
Manafort, the third lowest bidder on Bid Package No. 10, was doing excavation work at the East Haven High School site. Upon learning that BBE's bid contained a mistake, John Manafort told Pasquale Centore that if the plaintiff became the successful bidder, Manafort could garnishee monies that would be coming due to the plaintiff from East Haven. Paraphrasing John Manafort's words, he wanted East Haven to know that if Prete got the job, we would chase his compensation.
John Manafort gave Pasquale Centore some written materials concerning A. Prete Son Construction, Co., Inc. namely: three articles from the Middletown Press reporting disputes between the Town of East Haddam and A. Prete Son, Inc. as contractor for the construction of the new Hale-Ray High School, the eventual termination of that contract by the East Haddam School Building Committee and a threatened suit against East Haddam by A. Prete 
CT Page 7584 Son; a letter dated September 21, 1994 from the law firm representing East Haddam to the lawyer for Connecticut Waste Processing, Inc. stating that his client's remedy is against A. Prete and Aetna rather than against the Town; a letter dated August 22, 1994 from Aetna Casualty Surety Company to Manafort Brothers, Inc. disclaiming liability on a bond issued to A. Prete Son Construction Co., Inc. with the Town of East Haddam as obligee because the claim was not timely presented; a letter to Frank Manafort, Jr. from Attorney Haese concerning an apparent low bid by A. Prete Construction Co., Inc. on the Julia A. Stark Elementary School project in Stratford, plans to expand the scope of the present prejudgment remedy to include all ongoing Prete projects, plans to sue Aetna and the Town of East Haddam since Aetna refused to pay on the bond and the possibility of suing Neil Prete personally if he misrepresented on payment applications that subcontractors had been paid; copies of the complaint and application for a prejudgment remedy in a suit captioned ManafortBrothers, Inc. v. A. Prete Construction Co., Inc., where in Manafort asserted that it was a subcontractor for Prete in the East Haddam high school project and had not been paid. Centore, in turn, gave the written material to Attorney Zullo.
In addition to the newspaper advertisement for bids required by Gen. Stat. § 10-287(b) and the East Haven Charter, Pasquale Centore personally solicitated invitations to bid from firms that he thought could do the work such as BBE, the plaintiff and Manafort. After Jim Eacott submitted BBE's revised bid of $1,875,000.00, Pasquale Centore offered the suggestion that BBE hire Manafort as its subcontractor to do the Phase I and Phase II concrete work required by Bid Package No. 10. Eacott on April 18, 1985 made a note of their conversation in which he wrote "Pat thinks we [Fusco and BBE] will be fighting if we take the job at $1,875,000 and he wants Manafort to do the work because of single responsibility with site. I told him to talk to Manafort to see if they entertain taking the work at $1,850,000+/- (no bond, permit). If so we would probably walk away. The Town is reluctant to award to us yet due to potential precedent with other low bidders, but it looks promising that they will in order to save the $90,000+/- from Prete." Immediately after talking with Centore, Eacott called John Manafort and offered him the work required for Bid Package No. 10 on a revised bid of $1,875,000.00 with BBE paying the premium for the required bond and the permit fee. After several telephone calls, Manafort accepted BBE's offer.
A subcontract agreement was prepared by BBE and sent to CT Page 7585 Manafort on May 22, 1995. The consideration recited in the agreement was $1,836,542.00 but the agreement has never been signed by either party. The permit fee and the bond premium paid by BBE were $18,730.00 and $17,228.00 respectively.
In his capacity as counsel for the East Haven School Building Committee, Attorney Zullo engaged Dun Bradstreet to do a financial investigation on each of the bidders including a check of Superior Court records. He also discussed with the town counsel for East Haddam the problems that had existed between that town and A. Prete Son Construction Co., Inc. At the Building Committee's meeting on April 24, 1995, Attorney Zullo discussed whether BBE's revised bid should be accepted. He informed the Committee that his review of the law demonstrated that an attempt by East Haven to collect on the 10% bond that accompanied BBE's initial bid would probably not be successful and that a court would probably allow BBE to withdraw its initial bid of $1,704,000.00.
With reference to the plaintiff, Attorney Zullo learned of a $4,000,000.00 foreclosure action against A. Prete Son Construction Co., Inc., the suit by Manafort against A. Prete Son Construction Co., Inc. and other pending collection cases involving A. Prete Son Construction Co., Inc. Before the Committee on April 24, 1995, Attorney Zullo never separated A. Prete Son Construction Co., Inc. from the plaintiff Prete Enterprises, Inc. although he knew there were two separate Prete corporations albeit operating out of the same address. Moreover, he erroneously told the committee that at least some of the claims against A. Prete 
Son had been reduced to judgments against "Prete" thus providing credence for the opinion that he expressed on April 24 that he had doubts as to the plaintiff's financial ability to perform. He did not know at the time that in the case of Manafort Brothers, Inc. v.A. Prete Construction Co. Inc., the parties had agreed that Manafort could garnishee $410,000.00 owed by the Town of East Haddam without contest.
The function of the East Haven School Building Committee, according to Attorney Zullo, was to provide a recommendation for Mr. Tomchik. On April 24, 1995, after hearing from Attorney Zullo that decisional law especially the case of Fred Brunoli Sons,Inc. v. Woodbury, 4 Conn. App. 185 (1985) permitted acceptance of BBE's revised bid, the Committee recommended its acceptance to Mr. Tomchik by a six to three vote. The next day Pasquale Centore on behalf of Fusco wrote to Carl Tomchik lauding BBE and urging that it be awarded Bid Package No. 10 as well as Bid Package No. 17 CT Page 7586 another aspect of the work on which BBE was the low bidder. Centore's letter mentioned that "BBE employs a field crew capable of performing concrete and carpentry packages on construction management projects" and has "a dedication to quality, safety, and efficiency." Before the School Building Committee meeting and vote, Centore on April 19, 1995, in a letter to Tomchik advised that unless contracts on Bid Package No. 10, concrete work, and Bid Package No. 11, structural steel work were awarded by Friday, April 21, 1995, irreparable delays would be caused to other contractors and work that was scheduled for completion in December, 1995 would be extended into January and February, 1996.
In the meantime, BBE was finalizing its arrangement with Manafort. Centore informed Zullo that Manafort was to serve as BBE's subcontractor on Bid Package No. 10 on May 10, 1995 although, as previously stated, no written contract has been executed. No notification of Manafort's subcontractor status was given to the East Haven School Building Committee. The contract forbid Package No. 10 Phase I and Phase II was signed on May 12, 1995 despite its recited date of April 28.
The General Conditions in the Contract for Construction are incorporated by reference into the contract between East Haven and BBE. Article 5 of the General Conditions requires a contractor to give written notice of subcontractors to the Construction Manager for review for possible objection by the construction manager, owner and architect. A similar incorporation by reference exists in the unsigned contract between BBE and Manafort which also states "If the principal contract requires that subcontract agreement shall be approved by the Owner, this Subcontract Agreement shall become valid only upon such approval." These formal requirements have not been followed.
Before the contract was signed, the plaintiff sent two letters protesting East Haven's post-bid dealings with BBE as being in contravention of public bidding law and practice. One letter dated April 28, 1995 was addressed to the chairman and members of the School Building Committee. The second letter dated May 3, 1995 added Attorney Zullo and Town Counsel Attorney Albis to the list of recipients. Neither letter caused any action to be taken by the Town of East Haven.
The General Conditions in the Contract for Construction obligated all bidders to keep their bids open for ninety days which gave East Haven up to ninety days to determine who would be the CT Page 7587 successful bidder. The contract with BBE for Bid Package No. 10 was signed on May 12, 1995 because of the work schedule established by Pasquale Centore. Manafort has started the concrete work which now is about 6% complete. The situation is that after BBE took out the permit and furnished the bond there has been a complete delegation of performance on Bid Package No. 10 to Manafort.
Further findings of fact will appear in subsequent sections of this memorandum.
 II.
Before discussing the merits of the plaintiff's requests for injunctive and allied relief, a detailed explanation is in order as to the reasons for the court's denials of the motions to dismiss that were filed by each of the defendants prior to the introduction of evidence. In their motions, the defendants contended that the plaintiff as a disappointed bidder lacked standing to pursue its claims. The requirement of standing means that a party "cannot rightfully invoke the jurisdiction of the court unless [that party] has, in an individual or representative capacity, some real interest in the cause of action or a legal or equitable right, title or interest in the subject matter of the controversy."Tomlinson v. Board of Education, 226 Conn. 704, 717 (1993) quotingArdmare Construction Co. v. Freedman, 191 Conn. 497, 501 (1983). If the party lacks standing, the court is without subject matter jurisdiction to determine the suit. Tomlinson v. Board ofEducation, supra.
"Standing" with respect to competitive bidding laws is not uniform among the states. Ardmare Construction Co. v. Freedman,supra at 505 n. 12. As a general rule, such laws are considered to have been enacted for the benefit of the public and not for the bidders. John J. Brennan Construction Corporation, Inc. v.Shelton, 187 Conn. 695, 702 (1982). Traditionally, an unsuccessful bidder had no right to challenge the award of a public contract.Joseph Rugo, Inc. v. Henson, 148 Conn. 430, 433 (1961). InSpiniello Construction Co. v. Manchester, 189 Conn. 539, 545
(1983), however, our Supreme Court held that a rejected bidder did have standing where the claim was favoritism in the bidding process and the relief sought was an injunction. The court noted at 545 that "[t]here is a growing trend for courts to permit one who has been aggrieved by a refusal to award a public contract pursuant to lowest responsible bidder provisions to also vindicate the public interest by challenging such arbitrary or capricious action by CT Page 7588 governmental officials."
Subsequently in Ardmare Construction Co. v. Freedman, supra at 501, our Supreme Court characterized its Spiniello decision as an exception to the general rule applicable only where the conduct of the bidding officials has been influenced by fraud, corruption or favoritism or when the very object and integrity of the competitive bidding process is defeated by the conduct of municipal officials. Still later, in Unisys Corporation v. Department of Labor,220 Conn. 689 (1991), the court ruled that in a suit to enjoin the signing of a contract for computer services, a nonbidder would under the Spiniello exception have the same standing as a bidder if the plaintiff established that the reason no bid was made was that the proposal called for single source specifications available only from a competitor, that it had equipment that was equivalent and that the restrictions of the single source specifications undermined the object and integrity of the competitive bidding process, or that there was proof of favoritism.
Spiniello, Ardmare and Unisys either cited or referred with approval to Scanwell Laboratories, Inc. v. Shaffer, 424 F.2d 859
(D.C. Cir 1970). In that case the court said "The public interest in preventing the granting of contracts through arbitrary or capricious action can properly be vindicated through a suit brought by one who suffers injury as a result of illegal activity, but the suit is brought in the public interest by one acting essentially as a `private attorney general'". 424 F.2d at 864. Later on the same page, the Scanwell court described rejected bidders seeking to enjoin the execution or performance of public contracts as "people who will really have the incentive to bring suit against illegal government action and . . . precisely the plaintiffs to insure a genuine adversary case or controversy."
A few years ago this court wrote "[i]n the determination of standing, the primary focus is on whether the party bringing the complaint, is the proper party to request an adjudication of the issue and not whether the issue itself is justiciable." CivilService Commission v. Pekrul, 41 Conn. Sup. 302, 307 1 CONN. L. RPTR. 1 (1989) citing Flast v. Cohen, 392 U.S. 83, 99-100,88 S.Ct. 1942, 20 L.Ed.2d 94 (1968) aff'd 221 Conn. 13, 14 (1992). When the motions to dismiss were argued, the court's ruling was that the plaintiff had standing as being a proper party under Spiniello. Nothing in the many cases that have since been read has caused a change of mind.
III.
CT Page 7589
When analyzed, the plaintiff's position is that upon BBE's notice of the mistake in its original bid, East Haven was given three discrete options. The town could either hold BBE to its low bid precisely as submitted, or reject BBE's submitted bid and select the plaintiff as the lowest responsible bidder or reject all bids and submit Bid Package No. 10 to a second round of bidding. Admittedly there is some authority for the plaintiff's point of view. E.g. see Harry Pepper Associates, Inc. v. City of CapeCoral, 352 So.2d 1190, 1193 (Fla.App. 1977); Aqua-Tech, Inc. v.Como Lake Protection Rehabilitation District, 71 Wis.2d 541, 23.9 N.W.2d 25, 30 (1976); Danzl v. City of Bismark, 451 N.W.2d 127,130 (N.D. 1990). But the majority rule predicated on statutory construction and public policy is otherwise.
In Matter of Fischbach Moore, Incorporated v. The New YorkCity Transit Authority, 79 App.Div. 14, 435 N.Y.S.2d 984, 986 (1981) the statute in question like § 10-287(b) and chapter VI § 4(c) of the municipal charter, cited on page 2, did not contain any prohibition against an agency engaging in post-bid negotiations with a low bidder prior to awarding the contract. What these provisions do require is competitive bidding whereby the lowest responsible bidder is ascertained. From that point forward, the public agency or municipality may accept the lowest bid, negotiate further with the lowest bidder or reject all bids and start anew. In Matter ofFischbach Moore, 435 N.Y.S.2d at 988, a differentiation was made between post-bid negotiations with the low bidder and negotiations with others where by a contractor other than the original low bidder might become the low bidder. Free competition and the avoidance of favoritism and corruption are the crucial policies underlying competitive bidding laws. Although post-bid negotiations with the announced lowest bidder are not inconsistent with these policies, negotiations with any other bidder directly contravenes them. Browning-Ferri's Industries v. City of Oak Ridge, 644 S.W.2d 400,403 (Tenn.App. 1982). Accord: American Totalisator Co.,Inc. v. Seligman, 384 A.2d 242, 263, 265 (Pa. Comwlth. 1977) aff'd414 A.2d 1037 (Pa. 1980); Platt Electric Supply, Inc. v. City ofSeattle, 555 P.2d 421, 427 (Wash.App. 1976) (private negotiations with both the lowest and another bidder to get the best price).
Another instance involving post-bid negotiations is presented by Fabrizio Martin, Inc. v. Board of Education, 523 F.2d 378 (2d Cir 1975). There, the plaintiff was initially the second lowest bidder but the low bidder was permitted to withdraw. Two days after the bids were opened, the plaintiff discovered a mathematical CT Page 7590 error of $171,000.00 in its bid and asked for permission to withdraw or rebid. Discussions ensued between the parties as to whether $171,000.00 should be added to the plaintiff's bid which would still be lower than the next bid by $51,000.00 or whether the bid should be kept in its original amount and certain items totaling $171,000.00 should be eliminated from the work. The second alternative was chosen and a change order was executed along with the written contract. Applying New York law, the Second Circuit found nothing wrong with the post-bid negotiations because there was no evidence of favoritism or fraud and under the statute the public is entitled to have the job alone at the lowest cost. The case, however, contains the following caveat: the defendant Board would be obligated to solicit a second round of bids if there was a substantial possibility that another bidder would be lower than the plaintiff on the amended construction plans.523 F.2d at 383.
A comparison between Fabrizio Martin, Inc. v. Board ofEducation, supra and the instant case reveals a flaw in the plaintiff's proof. The plaintiff proved that BBE valued the work attributable to the missing portion of its original bid at $208,165.00 or $39,665.00 more than its revised bid of $1,872,500.00. Although labeling the amount of BBE's revised bid as contrived, the plaintiff failed to show that if the revised bid were increased by $39,665.00 to $1,912,165.00 it would have been interested.
Apparently when the lowest bidder makes a unilateral good faith mistake, Connecticut also permits negotiations between that bidder and the municipality. In the brief decision of Fred BunoliSons, Inc. v. Woodbury, 4 Conn. App. 185, 186 n. 3 (1985), the negotiations were described as a legitimate response to the situation.
Upon a review of the evidence, the court concludes that as inFischbach Moore, supra; Fabrizio Martin, supra and apparently in Fred Brunoli Sons, supra, there was no showing of fraud, corruption or favoritism or of any action that would defeat the integrity of the bidding process from the publication of the invitation to bid until the bids were opened and BBE was declared the low bidder. Hence there is no ground for the issuance of an injunction. Ardmare Construction Co. v. Freedman, supra at 505. The court, of course, expresses no opinion as to whether the post-bid conduct of any of the agents of the defendants amounted to interference with a business expectancy of the plaintiff. SeeCT Page 7591Sportsmen's Boating Corporation v. Hensley, 192 Conn. 747, 754
(1984); Della Construction, Inc. v. Lane Construction Co.,42 Conn. Sup. 202, 204 5 CONN. L. RPTR. 319 (1992); Conway Corporationv. Construction Engineers, Inc., 782 S.W.2d 36 (Ark. 1989).
Another reason to deny the injunction is that at the hearing the plaintiff did not establish itself as a responsible bidder as § 10-287(b) requires. In the Equal Opportunity Certificate which was a required part of each contractor's bid, the plaintiff listed Hospital of St. Raphael Cancer Care Center and East Haddam High School as previous projects. The evidence introduced by the plaintiff as well as the defendants showed one or both of these jobs to have been performed by A. Prete Son Construction Co., Inc. Neil Prete, the president of both "Prete" corporations, was present each day of the hearing but did not testify.
Statutes that require a public agency to award a contract to the lowest responsible bidder vest a wide discretion in the agency.Pioneer Co. v. Hutchinson, 220 S.E.2d 894 (W.Va. 1975). A builder's conduct under other contracts and the quality of previous work as well as financial ability are among the many factors that a public agency is entitled to review. Couch Construction Co.,Inc. v. Department of Transportation, 361 So.2d 184, 187
(Fla.App. 1978). Previously mentioned was Attorney Zullo's failure to distinguish between the two "Prete" corporations in his presentation to the East Haven School Building Committee. Since the plaintiff in a bid document sought to advantage itself by alleging participation in the work actually performed by A. Prete Son Construction Co., Inc., the court has no hesitancy in holding that Attorney Zullo and the School Building Committee acted reasonably in considering the work experience and the financial difficulties of A. Prete Son when discussing the responsible bidder status of the plaintiff. See John J. Brennan ConstructionCorp., Inc. v. Shelton, 187 Conn. 695, 703 (1982); FunderbergBuilders v. Abbeville County Memorial Hospital, 467 F. Sup. 821,824 (D.S.C. 1979).
In Connecticut, a party seeking injunctive relief has the burden of alleging and proving both irreparable harm and the lack of an adequate remedy at law. Berin v. Olson, 183 Conn. 337, 340
(1981); Theurkauf v. Miller, 153 Conn. 159, 161 (1965). The plaintiff argues that it does not to prove these prerequisites because its claim for an injunction has a statutory source. SeeConservation Commission v. Price, 193 Conn. 414, 429 (1984). A later and more refined statement of the "statutory source" CT Page 7592 exception is that "where a statute expressly provides for equitable remedies in addition to the ordinary legal ones, it maybe presumed that there is no adequate legal remedy because the legislature would not have provided the additional remedies if they were not needed. Burns v. Barrett, 212 Conn. 176, 193 (1989). No provision for equitable remedies appears in Gen. Stat. § 10-287. The exception is inapposite to this case as are certain regulations suggested by the plaintiff which deals with purchases by state agencies under chapter 58 (title 4a) of the general statutes. Even where the exception applies, it does not necessarily override a court's discretion in determining whether an injunction should be granted. Id. at 194. For example, in this case, the court would be obliged to consider the crowded school conditions as testified to by the East Haven Superintendent.
The court is well-aware that most jurisdictions prefer only injunctive relief and do not allow damages against a municipality in cases of misawards of public contracts. Annotation, Public Contracts: Low Bidder's Monetary Relief Against State or LocalAgency For Nonaward of Contract, 65 A.L.R. 4th 93 (1988); but cf.Marbucco Corp. v. City of Manchester, 632 A.2d 522, 524 (N.H. 1993). This preference for equity stemming from public policy is of no aid to the plaintiff for the reason that on the facts and law the court concludes that the plaintiff is not entitled to an injunction.
 IV.
Judgment is rendered for the defendants. Because this is an action where primarily equitable relief was sought each party will bear its own costs. Gen. Stat. § 52-257(e).